**In re ALCON DEMOLITION, INC., Debtor.**

**Bankruptcy No. 94–20369 (NLW).**

United States Bankruptcy Court, D. New Jersey.

Jan. 17, 1997.

Stern, Lavinthal, Norgaard & Daly, Englewood, NJ by Michael B. Kaplan, for Debtor.

Wolff & Samson, Roseland, NJ by Joseph Monaghan, Armen Shahinian, Whiteford, Taylor & Preston, Baltimore, MD by Robert M. Wright, George J. Bachrach, Robert F. Carney, for Connecticut Indemnity Company.

*OPINION*

NOVALYN L. WINFIELD, Bankruptcy Judge.

Before the Court is an objection by Alcon Demolition, Inc. ("Debtor" or "Alcon"), a reorganized debtor, to the revised proof of claim filed by Connecticut Indemnity Company ("Connecticut"). Connecticut has asserted claims against Alcon's bankruptcy estate totalling $873,732.39. In its revised proof of claim, Connecticut characterizes $378,107.81 of that amount as a claim secured by the net proceeds of an arbitration award in Alcon's favor. Alcon disputes both the amount of the claim and Connecticut's assertion that a portion of its claim is secured by the arbitration award.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Standing Order of Reference by the United States District Court of New Jersey dated July 23, 1984. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (B).

*FACTUAL BACKGROUND*

Debtor is engaged in demolition and environmental remediation services and has performed this work on a nationwide scale.

On January 20, 1994, Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey, and was continued in possession of its property and management of its financial affairs.

In the course of its business, Debtor regularly obtained payment and performance bonds in connection with its various projects. To induce Connecticut to issue such bonds Debtor executed a General Agreement of Indemnity (the "Indemnity Agreement") with Connecticut on July 30, 1992 pursuant to which Debtor agreed to indemnify and hold Connecticut harmless for any claims that might arise from the bonds. The indemnity agreement provides at paragraph two that "at all times" the Debtor will "indemnify and save [Connecticut] harmless from and against every claim, demand, liability, loss, cost, charge, counsel fee, payable on demand of Surety...." Paragraph eight further provides that in the case of construction contracts Alcon assigns all of its interest in such contracts to Connecticut, and agrees that in the event of default on a contract, Connecticut is subrogated to Alcon's rights in the contracts. Finally, paragraph nine states that all monies due under the contracts are trust funds for the payment of obligations due in connection with the contracts, or for payment of Connecticut if it satisfies Alcon's obligations.

Connecticut issued performance and payment bonds to Alcon on its contract with the George Hyman Company ("Hyman") for demolition and asbestos abatement at the World Bank in Washington, D.C. Prior to the Chapter 11, Hyman terminated its contract with the Debtor for alleged defaults in performance of work and payments due to employees and subcontractors. Pursuant to its performance and payment bond, Connecticut stepped in and paid claims on Debtor's behalf totalling $378,107.81. Connecticut further claims it incurred $378,756.88 in attorney's fees and expenses by reason of its efforts under the bonds.

Pursuant to their contract, Alcon and Hyman later submitted to arbitration their disputes as to the propriety of the termination and the amounts claimed for breach of contract. Alcon prevailed in the arbitration, and was awarded $585,000.00 for wrongful termination. Alcon also prevailed in the subsequent District Court litigation instituted by Hyman to overturn the award. That determination is currently under appeal. Debtor contends that the arbitration award is based on monies that it paid to its suppliers and does not include monies to compensate Alcon for taxes or Connecticut's payments to suppliers. Debtor's assertion is unsupported, inasmuch as no arbitration decision or any other similar document specifying the basis for the award has been supplied as an exhibit. Further, Debtor's position is puzzling in light of its acknowledgement that as part of the evidence of the damages it suffered from Hyman's alleged wrongful termination it presented proofs to the arbitration panel of the payments made by Connecticut on the Debtor's behalf.

Debtor confirmed a Plan of Reorganization by order of this court dated June 12, 1995.

The Alcon plan classified Connecticut's claim separately as Class IV and described it as a secured claim. In Article IV, Treatment of Claims and Interests, the plan proposed to treat Connecticut's claim as follows: "The allowed secured claim ... shall be satisfied through the Debtor's surrender of collateral in which the Class II [sic] claimant possess an interest." To the extent the collateral proved insufficient the plan provided that the remainder of Connecticut claim would share pro rata with the other unsecured creditors.

The Debtor's Disclosure Statement essentially described Connecticut's claim in the same terms as contained in the plan. Additionally, the Disclosure Statement treated two other matters which bear on the present dispute. The Debtor presented an analysis of various actions it had commenced against owners or contractors based on services performed, wrongful termination, and similar theories of recovery. The Alcon claim against Hyman was presented as follows:

> 3. Alcon v. The George Hyman Company for wrongful termination of contract, and for costs associated with material changes in the contract scope of work.

| Claim | $1,000,000.00 |
|---|---|
| Legal and Expenses | (430,000.00) |
| Bonding Company Payment Claims | (500,000.00) |
| Net | 70,000.00 |

The Disclosure Statement further stated that "To the extent [Debtor] is successful in the litigations/claims referenced above [including Connecticut's claim], the unsecured claims of the bonding companies shall be reduced in whole or in part by the recoveries." Id. In compliance with Local Rule 24, the Debtor, in its Disclosure Statement, also identified claimants whose claims it disputed. Connecticut was not so identified. However, the Debtor included a general statement that it reserved its rights to make such additional objections as it determined to be warranted.

Finally, Article 1 of the Plan sets forth the various applicable defined terms used in the Plan. An "allowed secured claim" is defined by consideration of the definition of "allowed" in section 1.3 and "secured claim" in section 1.44. Thus, an allowed claim is one "as to

which no objection to the allowance thereof has been interposed with the applicable period of limitations fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court...." A secured claim is defined as a claim "which is secured by a valid lien, security interest, or other interest in property in which the Debtor has an interest...."

Debtor initially objected to Connecticut's proof of claim on September 14, 1995.[1] This Court entered an Order on November 3, 1995 withdrawing Debtor's motion without prejudice pending resolution of the arbitration with Hyman. Connecticut filed a revised proof of claim on February 2, 1996, to which Debtor again objects.

### LEGAL ANALYSIS

#### A.

Connecticut has raised several defenses to Alcon's objections to claim that can best be described as preliminary and mostly procedural in nature. These defenses must be addressed at the outset before the more substantive issues are considered.

Connecticut first defends against Alcon's objections to its claim on the ground that the Debtor filed its objection outside of the time limit set in the Plan, and as provided in Local Rule of Bankruptcy Procedure 24. Relying upon In re Johns–Manville Corp., 7 F.3d 32 (2d Cir.1993), Connecticut argues that the Debtor's untimely objection deprived the Court of jurisdiction to decide the merits of Alcon's objection.

The local rules of court provide that, unless the plan states otherwise, all motions related to claims must be filed within sixty days after plan confirmation. Local R.Bankr.P. 24(c). Here, the Debtor's plan, in accordance with the local rule, provided that the last date for objections was to be sixty days subsequent to confirmation. Plan at ¶ 7.1. This Court entered its Order of Confirmation on June 12, 1995. Therefore, pursuant to the plan and local rule, the last day for filing objections was August 11, 1995. Because Debtor filed its initial objection on September 14, 1995, the objection was un-

---

**1.** The original proof of claim was filed on October 3, 1994.

timely under Local Rule 24 and the terms of the Debtor's Plan.

██ However, despite the tardiness of Debtor's motion, this Court will entertain the Debtor's objection. The court does not find the *Johns–Manville* holding applicable to the matter before it. In *Johns–Manville* the confirmation order contained a provision which established the time period for filing claims objections as 120 days from the date of the confirmation order, and further provided for waiver of any objections that were not filed in that time period. *Johns–Manville*, 7 F.3d at 31–33. The Alcon confirmation order did not contain any waiver provision.

Moreover, the 60 day time period provided in Alcon's Plan, and incorporated by reference in the confirmation order simply includes the provisions of Local Rule 24. Local Rule 1(b) provides that the application of any of the local rules can be modified or relaxed by the court in the interests of justice. Application of Local Rule 1(b) appears appropriate in the instant matter. Alcon's objection to Connecticut's claim was filed approximately one month later than the time period provided in the Plan. No prejudice to Connecticut is discernible from such time delay. Prejudice is particularly difficult to ascertain since on the return date of the original motion Connecticut agreed with the Debtor that the objection should be withdrawn until after the Hyman arbitration was concluded. Thus, even had the Debtor timely filed its objection, it is reasonable to assume that with Connecticut's acquiescence, the objection would have similarly been withdrawn. By contrast, in *Johns–Manville* the confirmation order was entered on December 22, 1986, and the claims objection motion was not filed until December 15, 1988. The Debtor argued that the 120 day time bar did not run until after October, 1988 when the last appeal was exhausted. The Second Circuit rejected the debtor's reasoning because (i) the very terms of the confirmation order set the deadline as 120 days from the date of the confirmation order, and not from the date said order became final on appeal, and (ii) the Debtor gave no explanation for its failure to timely object. Given that extraordinary time delay, the *Johns–Manville* case is inapposite to the present matter.

██ Connecticut has argued in the alternative that the motion is premature in that, while the arbitration produced a favorable decision for Alcon, that determination is not final due to Hyman's pending appeal. The Court finds this argument only partially suasive. Though Connecticut is indeed correct that the quantum of its claim may be affected by the outcome of the appeal, this Court must also address the larger question of the type of claim held by Connecticut, a priority issue that exists whether Connecticut's claim is $1 or $10,000,000. To that extent, the consideration of this motion is not premature.

██ Lastly, Connecticut presents something of an estoppel argument, pointing to 11 U.S.C. § 1141(a), which states that all terms of a plan of reorganization are binding on the debtor, and to Alcon's Plan itself, which provides that the treatment of an allowed claim cannot be modified without the claimant's consent. Thus, because the Plan and Disclosure statement state that Connecticut has an "allowed secured claim," Alcon should be precluded from now challenging that characterization. The court does not share Connecticut's interpretation of the terms of Alcon's Plan. The Court does not perceive the instant motion as an attempt either to modify the treatment of Connecticut's claim under the Plan or to circumvent terms of the Plan. Rather, Alcon by way of this motion challenges a portion of Connecticut's claim as not constituting an "allowed secured claim." The Plan itself contemplates that such an objection is proper, as it states that an "allowed" claim is one to which no objection has been filed or one that has been allowed in whole or in part by a Final Order of a bankruptcy court. These are precisely the issues that this motion seeks to resolve.

Accordingly, this Court will now address the merits of Debtor's objection to Connecticut's revised proof of claim.

### B.

Alcon's first and primary challenge to Connecticut's proof of claim is that Connecticut's failure to file UCC–1 Financing Statements

for the bonds renders its entire claim unperfected. Connecticut counters that under the principles of subrogation it has an equitable lien which is not subject to Article 9 of the Uniform Commercial Code ("U.C.C."). The Court agrees with Connecticut that Alcon cannot defeat its "security interest." The Court further finds in the alternative that, to the extent that Connecticut properly paid Alcon's materialmen and laborers, its rights to the proceeds of the Hyman settlement are superior to those of Alcon. Thus, the bankruptcy estate has only such interest in the funds that remains after Connecticut's claim is satisfied.

■ It must be noted at the outset that Alcon's attempt to argue that District of Columbia law should apply because of the choice-of-law provision in its underlying contract with Hyman is without merit. First, it is not the underlying contract between Alcon and Hyman that is at issue here. Rather, the governing document is the Indemnity Agreement between Alcon and Connecticut. Because that contract does not contain a choice-of-law provision, state law rules must be consulted. A federal court applies the choice-of-law doctrine in the forum state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). New Jersey courts employ a governmental interest analysis to determine what law should govern resolution of the matters in controversy. *Fineman v. Armstrong World Industries, Inc.*, 774 F.Supp. 225, 233 (D.N.J.1991) aff'd in part and rev'd in part 980 F.2d 171 (3d Cir.1992), *cert. denied* 507 U.S. 921, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993). Hence, because this matter requires interpretation of a contract executed in New Jersey by a New Jersey debtor, New Jersey's interests prevail and application of New Jersey law is appropriate. Second, even if District of Columbia law applies, the same result would be reached because the District's law fully recognizes the doctrine of subrogation, which this Court now applies. *See, e.g., District of Columbia v. Aetna Ins. Co.*, 462 A.2d 428 (D.C.1983). Debtor's reliance on the lack of District of Columbia lien law thus amounts to a legal non sequitur.

■ Subrogation is the substitution of one party in the place of another with respect to a lawful claim or right so that the substituted party succeeds to the rights of the other. *Black's Law Dictionary* 1427 (6th ed. 1990). The principle is one that arises out of obligation, rather than out of voluntary good will. *National Shawmut Bank of Boston v. New Amsterdam Cas. Co.*, 411 F.2d 843, 844 (1st Cir.1969). Subrogation is a venerable doctrine of "pure unmixed equity, having its foundation in the principles of natural justice." *Prairie State Nat'l Bank of Chicago v. United States*, 164 U.S. 227, 231, 17 S.Ct. 142, 144, 41 L.Ed. 412 (1896) (quoting *Gladsen v. Brown*, Speer, Eq. 37, 41 (Johnson, Ch.)). The concept is best understood in terms of one who has performed his obligatory duties, the subrogee, stepping into the shoes of another, the subrogor. The equitable effect of subrogation is to insure that the subrogee, who had no choice but to perform his duties, will be compensated through exercise of the subrogor's rights. To allow the subrogor to keep his rights would result in unjust enrichment. Some form of subrogation is recognized in all jurisdictions, including New Jersey and the District of Columbia. *See, e.g., District of Columbia v. Aetna Ins. Co.*, 462 A.2d 428 (D.C. 1983); *Stevlee Factors v. State*, 136 N.J.Super. 461, 346 A.2d 624 (Ch.Div.1975).

■ Nowhere is subrogation more appropriate or common than in the context of suretyship. Indeed, the Supreme Court has noted that "there are few doctrines better established than that a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed." *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 136–37, 83 S.Ct. 232, 235, 9 L.Ed.2d 190 (1962). Where a surety performs or pays subcontractors to perform pursuant to a performance and payment bond, it has rights to reimbursement from the remaining contract funds. *Henningsen v. United States Fid. & Guar. Co.*, 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908); *Prairie State Nat'l Bank*, 164 U.S. 227, 17 S.Ct. 142. Further, the rights to which the surety is subrogated are not limited to those of the insured. To continue the shoe-stepping anal-

ogy, subrogation allows a surety who has come onto a construction job to complete the project and pay subcontractors under its performance bond to

> step into three sets of shoes.... [I]t stands in the shoes of the contractor insofar as there are receivables due it; in the shoes of laborers and material men who have been paid by the surety—who may have liens; and, not least, in the shoes of the government, for whom the job was completed.

*National Shawmut Bank,* 411 F.2d at 845. Thus, a surety has an "equitable lien" against the identifiable proceeds of the underlying contract. *See, e.g., Pearlman,* 371 U.S. at 137, 83 S.Ct. at 235. Accordingly, Connecticut has an equitable lien on any funds ultimately determined to be due from Hyman to Alcon to the extent of its satisfaction of Alcon's obligations to materialmen and laborers.

 In fact, equitable subrogation rights are superior in priority to perfected bank liens, even in the absence of U.C.C. filing. *In re Modular Structures, Inc.,* 27 F.3d 72, 79 n. 7 (1994) (citing *Transamerica Ins. Co. v. Barnett Bank of Marion County,* 540 So.2d 113 (Fla.1989)); *Stevlee Factors,* 136 N.J.Super. at 466, 346 A.2d 624. A security interest under Article 9 of the U.C.C. must be created by agreement and attach to a specific item of collateral in which the debtor has rights. N.J.S.A. 12A:9–204(1). While the agreement creates the priority of the secured party as to the debtor with whom he has contracted, the filing of a financing statement serves to put third parties on notice that the collateral is encumbered. Upon filing, no third party can acquire from the debtor rights greater than those of the secured party. *See generally* N.J.S.A. 12A:9–301 *et seq.* None of the concerns addressed by the U.C.C. filing requirements are implicated in the surety context. A construction surety is "secured" not by collateral per se, but rather by the "opportunity, on default, to finish the job and apply any available funds against its cost of completion." *National Shawmut Bank,* 411 F.2d at 845–46 (discussing distinctions between Article 9 and sureties). The reasoning that underlies such a result is that, but for the acts of the surety to pay materialmen and laborers and complete the project, none of the contract funds would have ever been owing to the defaulting contractor. *See Jacobs v. Northeastern Corp.,* 416 Pa. 417, 206 A.2d 49 (1965) (holding that subrogation rights are not security interests under U.C.C. Article 9). While it is true that Connecticut's Proof of Claim characterizes its claim as "secured, pursuant to the terms of the Plan of Reorganization, by the net proceeds of the arbitration award," this is merely an assertion of an "equitable lien" through subrogation. Thus, filing is unnecessary to achieve priority through subrogation. *Modular Structures,* 27 F.3d at 79.

 However, since Connecticut, by virtue of its subrogation rights has also succeeded to Alcon's right to payment from Hyman, it need not rely solely on its "secured" status. As the Debtor recognized and set forth in its Disclosure Statement, the bankruptcy estate has an interest in any recovery against Hyman only to the extent funds remain after Connecticut's claim is satisfied. Filing a bankruptcy petition creates an estate containing "all legal and equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Determination of these property rights is a matter of state law. *Universal Bonding Ins. Co. v. Gittens & Sprinkle Enter., Inc.,* 960 F.2d 366, 369 (3d Cir.1992) (citing *Butner v. United States,* 440 U.S. 48, 54, 99 S.Ct. 914, 917–18, 59 L.Ed.2d 136 (1979). The doctrine of subrogation has the effect of removing the subrogee's traceable property interest from the bankrupt estate for much the same reasons as an equitable lien arises in a nonbankruptcy context. At the debtor's default on the underlying contract, he is not entitled to the contract funds because performance has not been completed and because materialmen and laborers have not yet been paid. When the surety performs in the place of a debtor and completes the contract, the entitlement to contract funds arises. However, equity demands that the debtor not receive a windfall. Thus, subrogation places the surety in the position to exercise the debtor's rights to identifiable

contract funds, effectively removing that property from the estate and rendering it unavailable to general creditors. The Third Circuit has explicitly adopted such reasoning, holding that, to the extent necessary to reimburse a surety for monies actually paid out in accordance with its obligations under an indemnity agreement, such funds are not properly part of the estate. *Modular Structures,* 27 F.3d at 77–78 (citing *Stevlee,* 136 N.J.Super. at 461, 346 A.2d 624 ("Since the sureties stand in the place of those whose claims they have paid, the funds must be paid to the sureties just as the funds would have gone in the absence of a bond—to the labor and materialmen rather than to the general creditors." *Id.* at 466, 346 A.2d 624.)).

Similarly, in *Pearlman,* the seminal case on subrogation of sureties, a dispute arose between a surety and a bankruptcy trustee for a government contractor over some $87,-000 in contract funds that had been withheld by the government. The surety, by operation of its agreement with the debtor, had paid out roughly $350,000 to laborers and materialmen in connection with completion of the project. The Supreme Court concluded that the retained funds in the hands of the government were not property of the bankrupt estate and that the surety who had paid materialmen and laborers under a bond was subrogated to the fund—that is, it stepped into the shoes of the laborers and materialmen, assuming all their rights. Essentially, the traceable contract funds were, through subrogation removed from the bankrupt estate and the reach of the trustee and the general creditors. It is important to note, however, that to the extent that the surety had claims against the debtor that exceeded the retained funds, it had a simple unsecured claim as to the rest of the amounts it paid out.

Thus, Alcon's attempt to limit Connecticut's rights to those conferred upon materialmen by state lien laws is misplaced. Here, it is undisputed that Connecticut entered into a suretyship agreement with Debtor and subsequently performed under that agreement. Connecticut thus became subrogated to all rights of Debtor under the contract to the extent of its performance—namely $378,-107.81—under both equity and the express terms of the contract. Because of this subrogation, Connecticut stands in the shoes not only of Debtor as to receivables, but also those of the materialmen and laborers as to their liens, and of Hyman with respect to any payment that is identifiable to the contract. Clearly, Connecticut must be seen as subrogated to the rights of Alcon as to any arbitration proceeds, as these are identifiable to the contract.

Assuming that the arbitration award is upheld in the pending litigation, Connecticut is entitled to payment to the full amount of its claim allocable to the Hyman project, less expenses, from the proceeds of the award. Any deficiency due to a reduction of the award is properly treated as an unsecured claim pursuant to the terms of the Plan.

## C.

■■■■ Connecticut further claims that it is entitled to the funds by operation of the New Jersey law of trusts. Generally, a trustee holds legal title to a piece of property—the trust *res*—for the benefit and enjoyment of another. *In re Armour's Will,* 33 N.J. 517, 166 A.2d 376 (1960). The trustee, in a fiduciary relationship with the trust beneficiary, is bound to abide by the terms of the trust to benefit the beneficiary. *Id.* at 524, 166 A.2d 376. Ultimately, four elements must be present to establish an enforceable trust: 1) the settlor must express an intent to create a trust; 2) there must exist a trust *res;* 3) there must be an identifiable beneficiary; and 4) there must be a trustee.

■■■ All these elements have been met here by the Agreement of Indemnity, executed by both Debtor and Connecticut, which provided that:

It is expressly understood and declared that all monies due or to become due under any contract or contracts covered by the Bonds are trust funds, whether in the possession of [Debtor] or otherwise for the benefit of and for payment of all such obligations in connection with any such contract or contracts for which [Connecticut] would be liable under any of said Bonds, for which said trust also inures to the benefit of [Connecticut] for any liability

of loss it may have to sustain under any said Bonds, and this Agreement and Declaration shall also constitute notice of such trust.

Agreement of Indemnity ¶ 9. The language of the Agreement expressly states that a trust is to be created. The agreement further specifies that the trust *res* will consist of "all monies due or to become due" for any bonded contracts on which Connecticut must perform. It is clear from the Agreement that the materialmen and laborers, along with Connecticut in the case of payment under the bonds, are the beneficiaries of the trust. It is equally clear that Debtor is the trustee, and is thus bound by the terms of the trust provision. Restatement (Second) Trusts § 2. For these reasons, the Agreement of Indemnity has established a trust that is valid and enforceable under New Jersey law.

The next inquiry is whether the proceeds of the Hyman Arbitration may properly be included in the trust. The arbitration resolved a claim of wrongful termination by Debtor against Hyman. At the arbitration proceedings, Debtor, in its effort to show damages, presented evidence of the payments made by Connecticut under the performance bond. In awarding the sum of $585,000.00, the arbitrator apparently accepted Debtor's claims and took them into consideration in calculating its award. It is thus clear to this Court that the arbitration award constituted monies due under the contracts and is therefore a part of the trust *res.* As such, Debtor, as trustee, has no beneficial interest in the arbitration award to the extent of the payments made by Connecticut under the Agreement of Indemnity. Debtor is bound by fiduciary duty to pay over these funds to Connecticut as beneficiary of the trust. *Universal Bonding Ins. Co. v. Gittens and Sprinkle Enter., Inc.,* 960 F.2d 366, 373 (3d Cir.1992); *Georgia Pacific Corp. v. Sigma Service Corp.,* 712 F.2d 962, 968 (5th Cir.1983).

### D.

■ Finally, Connecticut has argued that Debtor should be judicially estopped from challenging the propriety of the payments made by Connecticut. The principles of the judge-made doctrine of judicial estoppel emerged to prevent parties from playing fast and loose with the court by taking inconsistent factual or legal positions in different proceedings. *Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F.2d 414, 419 (3d Cir.1988); *see also Yanez v. United States,* 989 F.2d 323, 326 (9th Cir.1993). Most recently, the Third Circuit ruling in *McNemar v. The Disney Store,* 91 F.3d 610 (3d Cir. 1996), expanded the doctrine to include not only statements made to judicial entities, but also positions taken in administrative filings.

During the arbitration proceeding with Hyman, Debtor presented testimony from Roxanne Kasten ("Kasten"), a paralegal for Connecticut's counsel. The testimony was adduced to show the damages Alcon had suffered as a result of payments made by Connecticut under the performance bond. As set forth in Kasten's certification, Kasten prepared and provided to Alcon all of the documentation that supported the payments Connecticut made in connection with the Hyman project. Kasten further stated that

> On November 1, 1995 I was called by the attorneys for Alcon to testify on behalf of Alcon at the arbitration proceedings. During my testimony, I authenticated the exhibits regarding Connecticut's payments and described the investigation made by Connecticut to determine the proper amounts to pay to Alcon's employees, subcontractors and suppliers on the World Bank project. In particular, I testified as to how the claims were received, investigated and paid on behalf of Alcon in connection with the payment bond issued by Connecticut to Hyman on behalf of Alcon.

Kasten Certification at ¶ 7.

Alcon concedes that the aforementioned testimony and documentation was introduced by it during the arbitration proceeding, but contends that the evidence was adduced solely to demonstrate (i) that Connecticut made the payments and (ii) the amount of the payments, so as to prove the damages that resulted from its wrongful termination by Hyman. It argues that it can challenge Connecticut's claim based on what it alleges was Connecticut's failure to properly investigate

and prosecute Alcon's claim of wrongful prosecution.

Unfortunately, neither party has presented the Court either with a copy of the arbitration decision or with a transcript of Kasten's testimony at the proceedings. The Court simply has before it two different interpretations of the arbitration proceeding. Without more, the Court is unable to determine which interpretation is most accurate. Accordingly, determination of this objection is deferred pending further factual development.

### F.

Alcon has also objected to the reasonableness of the attorney fees claimed by Connecticut. It also seems to suggest, somewhat generally, that Connecticut's proof of claim may be subject to the doctrines of setoff or recoupment. Alcon claims that Connecticut's dealings with Hyman caused or facilitated its wrongful termination by Hyman. Further, the Debtor claims that it has pending litigation against Connecticut for tortious interference with its contracts and that the Connecticut proof of claim may be reduced by a recovery in that litigation. All the foregoing objections clearly rest on disputed facts and must await further hearing.

### CONCLUSION

As set forth above, the Court concludes that the Debtor cannot avoid Connecticut's superior interest to any funds ultimately due from Hyman. However, determination of the amount of the Connecticut claim that may be satisfied from such funds requires further factual development.