## In re ENRON CORP., et al., Debtor.

**American Home Assurance Co. and Federal Insurance Co., Plaintiffs–Appellants,**

v.

**Enron Natural Gas Marketing Corp. and Enron Corp., Defendants–Appellees,**

**and**

**J.P. Morgan Chase & Co. and American Public Energy Agency, Defendants.**

No. 03 Civ. 2289(SAS).

United States District Court, S.D. New York.

Jan. 8, 2004.

Robin E. Keller, Robert Lewin, James A. Shifren, Stroock & Stroock & Lavan LLP, New York, NY, for Plaintiff–Appellant American Home Assurance Co.

John F. Horstmann, Lawrence J. Kotler, Lauren Lonergan Taylor, Duane Morris LLP, Philadelphia, PA, for Plaintiff–Appellant Federal Insurance Co.

Martin J. Bienenstock, Brian S. Rosen, Howard B. Comet, Stephen T. Loden, Weil, Gotshal & Manges LLP, New York, NY, for Defendants–Appellees Enron Natural Gas Marketing Corp. & Enron Corp.

Lowell Gordon Harriss, James L. Kerr, Davis Polk & Wardwell, New York, NY, for Defendant J.P. Morgan Chase & Co.

Meryl R. Lieberman, Hawthorne, NY, Dennis J. Moynihan, Michael G. Connery, John E. Musselman, Kutak Rock LLP, Omaha, NE, for Defendant American Public Energy Agency.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

American Home Assurance Co. ("American Home") and Federal Insurance Co. ("Federal") (collectively, the "Sureties") appeal from the order of the Bankruptcy Court (Gonzalez, J.) denying summary judgment for the Sureties and dismissing the Complaint.[1] At issue is approximately $33.5 million in excess margin collateral monies ("Excess Collateral") to which the Sureties allege they are entitled. The Bankruptcy Court concluded that the Sureties were not entitled to the Excess Collateral under either the terms of their agreement or subrogation principles. The Sureties bring this appeal pursuant to 28 U.S.C. § 158, which grants the district courts jurisdiction to hear appeals from final judgments or orders of bankruptcy judges. For the reasons set forth below, the Bankruptcy Court's order is affirmed.

## I. BACKGROUND

### A. The Agreements

#### 1. Gas Purchase Agreement

On April 8, 1999, Enron Natural Gas Marketing Corp. ("ENGMC") entered into a twelve-year Gas Purchase Agreement ("GPA") with American Public Energy Agency ("APEA"), a Nebraska political subdivision.[2] Under the agreement, APEA pre-paid the full price for the twelve-year natural gas supply—approximately $287 million.[3] This payment was funded through the issuance of public municipal bonds.

In the event of ENGMC's default, the GPA provided for two types of damages. *First*, ENGMC would be obligated to pay an early termination payment ("Termination Payment")[4] to compensate APEA for the balance of the natural gas owed to it under the GPA.[5] *Second*, the disadvantaged party would be entitled to the payment of "Market Exposure Damages."[6]

---

1. 2/25/03 Memorandum Decision and Order Denying Sureties' Motion for Summary Judgment Concerning Declaratory Judgment Action and Granting Debtors' Request for Dismissal of the Complaint ("2/25/03 Order"), No. 01 B 16034(AJG), American Home's Appendix ("App.") at 574.

2. *See* Complaint ¶ 1, App. at 1–2; ENGMC's and Enron Corp.'s Answer ("Enron's Answer") ¶ 1, App. at 63; APEA's Answer ¶ 1, App. at 37; 2/25/03 Order at 3, App. at 576.

3. *See* Complaint ¶ 1, App. at 2–3; Enron's Answer ¶ 1, App. at 63; APEA's Answer ¶ 1, App. at 37; 2/25/03 Order at 3, App. at 576.

4. Termination Payment is defined as "the amount, exclusive of Market Exposure Damages, to be paid following early termination of the [GPA] as provided in Section 4.1." Enfolio General Provisions ("GPA General Provisions"), App. at 131.

5. *See* 2/25/03 Order at 3, App. at 576; GPA, art. 4.1(b), App. at 124. Under the GPA, ENGMC was obligated to make the Termination Payment if a "Triggering Event," *see id.*, art. 4.2, App. at 124 (enumerating the "Triggering Events"), occurred. *See id.*, art. 4.1(a), App. at 124. Because the Termination Payment would be "difficult to ascertain," the parties agreed that the "liquidated amount of the Termination Payment would be the Amortized Price, plus accrued interest to the redemption date, for redemption of the Bonds outstanding at the time of redemption less amounts ... on deposit in the debt service reserve fund established with respect to the bonds." *Id.*, art. 4.1(b), App. at 124.

6. *See* GPA, art. 4.1(c), App. at 124. "Market Exposure Damages" are calculable at any given time as follows: the difference between the then-current market price of natural gas and the fixed contract price multiplied by the final undelivered gas volume. *See* GPA General

As discussed in some detail below,[7] to secure payment of the Termination Payment, ENGMC was required under the GPA to purchase a surety bond. Moreover, to secure payment of the Market Exposure Damages, ENGMC was required to enter into a Margin Agreement with APEA.

The GPA contained several provisions relating to the rights of the parties in the event of a default. *First,* pursuant to article 4.4 of the GPA, the parties preserved "all rights, set-offs, counterclaims and other remedies and defenses consistent with *Section 8.3*[8] ... arising from or out of [the GPA]; *provided, however,* that amounts due as the Termination Payment or as Market Exposure Damages shall not be subject to rights of setoff."[9] *Second,* pursuant to article 3.6 of the GPA, the parties agreed that the Termination Payment was to be payable "from the proceeds of the Surety Bond; *provided,* however, that proceeds of the Surety Bond shall not be applied to the payment of any amounts due as Market Exposure Damages."[10] Similarly, "[t]he obligation of [ENGMC] to pay Market Exposure Damages shall be secured by the Margin Agreement. Amounts payable pursuant to the Margin Agreement shall be applied *solely* to pay-

ment of Market Exposure Damages."[11] "The Termination Payment shall be payable on the Early Termination Date, and shall be payable *solely* from the proceeds of the Surety Bond."[12]

### 2. Surety Bond

ENGMC was required to provide APEA with a "Surety Bond," which is described in the GPA as the bond "posted by [ENGMC] to support performance of its obligations to make Termination Payments under [the GPA]."[13]

Accordingly, ENGMC, American Home, and Federal provided APEA with a surety bond dated April 15, 1999.[14] The Surety Bond states that payment by each surety constitutes "satisfaction in full of all of its obligations.... Such payment shall be the exclusive remedy of [APEA] under this Bond. Upon payment by a Surety, [APEA] shall assign its rights to payment against [ENGMC] under the [GPA] to such Surety."[15] As noted earlier, section 3.6 of the GPA specifically states that the Termination Payment shall be payable from the Surety Bond, provided that the proceeds from such bond are not applied to the

---

Provisions, App. at 131. The obligation to pay damages was mutual. That is, if the Market Exposure Damages were positive, ENGMC would be obligated to pay APEA. But, if the Market Exposure Damages were negative, APEA would owe damages to ENGMC. *See* GPA, art. 4.1(c), App. at 124.

7. *See infra* Part I.A.2–3.

8. Under article 8.3 of the GPA,
Express remedies and measures of damages provided in this agreement satisfy the essential purposes hereof. For breach of any provision for which an express remedy or measure of damages is herein provided, such express remedy or measure of damages shall be the sole and exclusive remedy hereunder ... and all other remedies or damages at law or in equity are waived.
GPA art. 8.3, App. at 126.

9. *Id.,* art. 4.4, App. at 125.

10. *Id.,* art. 3.6, App. at 124.

11. *Id.* (emphasis added).

12. *Id.,* art. 4.1(b), App. at 124 (emphasis added).

13. GPA General Provisions, App. at 131.

14. *See* 4/15/99 Advance Payment Supply Surety Bond ("Surety Bond"), App. at 287. The Surety Bond is expressly governed by the laws of Nebraska. *See id.* ¶ 10, App. at 290.

15. *Id.* ¶ 5, App. at 289.

payment of Market Exposure Damages.[16]

On April 5, 1999, in connection with the Surety Bond, ENGMC and Enron Corp. executed indemnity agreements with the Sureties.[17] Under these agreements, ENGMC had agreed to indemnify the Sureties for any payments they might make under the Surety Bond.[18] While the indemnity agreements provided for ENGMC to post collateral to cover the Surety Bond,[19] ENGMC never provided such collateral. Under the indemnity agreements, ENGMC and Enron Corp. had waived "all right to claim any property, including homestead as exempt from levy, execution, sale or other legal process under the law of any state, province or other government as against the right of the surety to proceed against the same for indemnity."[20]

### 3. Margin Agreement

Pursuant to the GPA, ENGMC and APEA entered into the Margin Agreement on April 8, 1999.[21] The Margin Agreement states that "[a]s security for the payment of the Market Exposure Damages due or that may become due from [ENGMC] to [APEA], [ENGMC] hereby grants to [APEA] a security interest in all Margin from time to time delivered to [APEA] pursuant to this Agreement."[22] The Margin Agreement provided that if ENGMC failed to pay Market Exposure Damages, APEA or its designee could liquidate any non-cash margin.[23] Importantly, the Margin Agreement stated that if, during the pendency of the agreement, the fair market value of the margin exceeded the value of the margin required to be maintained under the agreement, ENGMC could request the return and/or release of the margin upon written request.[24]

APEA contemporaneously executed a Swap Agreement with The Chase Manhattan Bank ("Chase"), assigning to Chase its (APEA's) rights under the Margin Agreement (*i.e.*, APEA's right to recover Market Exposure Damages).[25] Damages under the Swap Agreement were triggered by the occurrence of a "Triggering Event," as defined by section 4.2 of the GPA.

APEA also executed the April 7, 1999 Gas Supply Bond Resolution ("Bond Resolution") authorizing the sale of public bonds.[26] Under the Bond Resolution, the Bond Trustee was required to set up a

---

**16.** *See* GPA, art. 3.6, App. at 123–24.

**17.** 4/5/99 Continuing Agreement of Indemnity Miscellaneous Surety Bonds Made for the Benefit of American Home and Others ("American Home Indemnity Agreement"), App. at 135; Federal Insurance Company General Agreement of Indemnity ("Federal Indemnity Agreement"), App. at 144.

**18.** *See, e.g.,* American Home Indemnity Agreement ¶ Second, App. at 135 ("[I]n consideration of the execution of any such bond . . . and as an inducement to such execution or forbearance . . . the Undersigned agree and bind [themselves] . . . . [t]o indemnify . . . and hold and save harmless the Surety against all demands, claims, laws, costs, damages, expenses, and attorneys' fees whatever [] and all liability therefore, sustained or incurred by the Surety by reason of executing . . . any said Bond. . . .").

**19.** *See id.* ¶ Third, App. at 135.

**20.** *Id.* ¶ Ninth, App. at 136.

**21.** *See* GPA, art. 3.6, App. at 123–24.

**22.** 4/8/99 Margin Agreement ¶ 7, App. at 114.

**23.** *See id.* ¶ 8, App. at 115.

**24.** *See id.* ¶ 3, App. at 113.

**25.** *See* 4/8/99 Swap Agreement Ex. III, ¶ 1, App. at 194. The assignment of contract rights was made under and was governed by the laws of New York State. *See id.* ¶ 3(g), App. at 196.

**26.** *See* 4/7/99 Bond Resolution, App. at 354.

margin account to hold the margin deposited by ENGMC pursuant to the Margin Agreement and a collateral account to hold deposits by Chase to fund APEA's obligation to pay Market Exposure Damages.[27] The Bond Resolution specifically provides in a term entitled "Margin Fund—Margin Account," that "[u]pon termination of the Swap Agreement and the payment [to Chase] of all early termination payments due from APEA, all amounts in the Margin Account, including any remaining Margin, shall be transferred to the Gas Supplier [ENGMC]." [28]

### B. Events Leading to Bankruptcy Proceedings

In November 2001, Enron's debt rating was downgraded, prompting the Sureties to request that ENGMC and Enron provide collateral to secure the Sureties' right to indemnification.[29] No collateral was provided.[30] On December 2, 2001, Enron Corp. and ENGMC filed for bankruptcy protection and ENGMC subsequently defaulted on its obligations under the GPA. Shortly thereafter, APEA notified ENGMC that the GPA would terminate on January 16, 2002.[31] The Sureties made another unsuccessful request that ENGMC provide collateral.[32]

The termination of the GPA precipitated two events. *First*, Chase declared a default under the SWAP Agreement. At the time, there was approximately $111 million in the margin account to which Chase applied approximately $77.5 million against its Market Exposure Damages.[33] The remainder, the so-called "Excess Collateral," totals approximately $33.5 million. *Second*, on January 16, 2002, the Sureties paid APEA the $251 million Termination Payment pursuant to their obligations under the Surety Bond.[34] Consequently, APEA executed a Release and Assignment, assigning to the Sureties "[APEA's] rights to payment against ENGMC under the Surety Bond and the GPA." [35]

### C. The Proceedings Below

On March 15, 2002, the Sureties filed an adversary proceeding seeking a "declaration as to their rights to [the Excess Collateral] and turnover of such funds to the Sureties." [36] The Sureties then moved for summary judgment pursuant to Federal Rule of Bankruptcy Procedure 7056,[37] and the Bankruptcy Court heard oral argument on the motion on October 17, 2002.[38]

---

27. *See id.* §§ 5.10–5.11, App. at 379–80.

28. *Id.* § 5.10(b), App. at 379.

29. *See* Letter to Kenneth Lay, Enron's CEO, from Michael Fay, American Home's Senior Vice President in the Surety Division, App. at 227; 11/21/01 Letter to Kenneth Lay from Michael Fay, App. at 229; 11/16/01 Letter to Jeffrey McMahon, Enron's CFO, from Richard Towle, Federal's Surety Claims Manager, App. at 323.

30. *See* Compl. ¶ 31, App. at 9.

31. *See* 2/25/03 Order at 8, App. at 581.

32. *See* 1/7/02 Letter to ENGMC from American Home, App. at 243.

33. *See* Compl. ¶ 35, App. at 10.

34. *See* 1/16/02 Release and Assignment, App. at 344.

35. *Id.*

36. 2/25/03 Order at 8, App. at 581.

37. Fed. R. Bankr.P. 7056 states that Federal Rule of Civil Procedure 56 applies in adversary proceedings.

38. In the moving papers submitted to the Bankruptcy Court, the Sureties argued that they were entitled to the Excess Collateral because: (1) "by virtue of payment on the surety bond, the Sureties have an equitable lien on the Excess Collateral and subrogate to all of APEA's and ENGMC's rights with respect to Excess Collateral"; (2) "the [GPA] ... and its component agreements constitute

The Bankruptcy Court denied the motion for summary judgment and granted debtor's request seeking dismissal of the Complaint. Summary judgment was denied on several grounds.

*First,* Judge Gonzalez found that "for the Sureties to be entitled to receive the Excess Collateral if they subrogate to ENGMC's rights, the fund in issue had to be amounts payable or 'owing' under the contract, or an amount that came into existence as a result of being owing or payable pursuant to the contract." [39]

*Second,* because APEA had no "right to look to the amounts payable from the Margin Agreement to fund the Termination Payment ... the Sureties cannot acquire a greater right by subrogation to APEA's interest." [40] The "plain language of the GPA provides that the Termination Payment was to be paid solely from the proceeds of the Surety Bond, GPA, art. 4.1(b), and proceeds of the Surety Bond were not to be applied to the payment of any amounts due as Market Exposure Damages." [41]

*Third,* the Sureties had no right to recoupment of the Excess Collateral, *i.e.,* the Sureties were not entitled to setoff as to the funds held pursuant to the Margin Agreement. Specifically, while section 553 of the Bankruptcy Code allows setoff of mutual debts that arose prior to the commencement of the case, "APEA expressly waived its right to assert setoff." [42]

The Sureties filed a timely Notice of Appeal of the Bankruptcy Court's memorandum decision and order.

## II. DISCUSSION

### A. Standard of Review

A bankruptcy court's conclusions of law are reviewed *de novo* and its findings of fact for clear error. [43] Because the parties agree that there are no factual issues in dispute, [44] *de novo* review is required.

### B. Issues on Appeal

The Sureties argue that the Bankruptcy Court erred in denying the Sureties' mo-

---

one single integrated transaction, pursuant to which the Sureties' contractual equitable rights to the Excess Collateral outweigh all other claims"; (3) "under the Bankruptcy Code's 'safe harbor' provisions [sections 556 and 362(b)] relating to forward contracts, the Sureties are entitled to [] the Excess Collateral as liquidation of a forward contract"; and (4) "the Sureties, as subrogees and assignees of APEA are entitled to ... the Excess Collateral." Sureties' Memorandum of Law in Support of Their Motion for Summary Judgment at 4. Enron and ENGMC argued that the Sureties were not entitled to the Excess Collateral either through subrogation to the rights of APEA or ENGMC, or through setoff or recoupment. ENGMC and Enron's Response in Opposition to Plaintiffs' Motion for Summary Judgment at 12, 24.

39. 2/25/03 Order at 18, App. at 591.

40. *Id.* at 12, App. at 585.

41. *Id.* at 11, App. at 584.

42. *Id.* at 13, App. at 586. The Bankruptcy Court explained:

> Inasmuch as section 8.3 of the GPA set forth that the availability of specific remedies and measures of damages for breach of a contract provision operated as a waiver of other remedies or damages at law or in equity, the right to setoff for payment of the Termination Payment or Market Exposure Damages was "expressly ... waived" in the GPA.

*Id.* at 13–14, App. at 586–87.

43. Fed. R. Bankr.P. 8013; *see also In re Bayshore Wire Prods. Corp.,* 209 F.3d 100, 103 (2d Cir.2000); *In re Salem,* 290 B.R. 479, 482 (S.D.N.Y.2003).

44. *See* Brief of Appellant Federal ("Federal App. Mem.") at 4; Brief of Appellant American Home ("American Home App. Mem.") at 6; *see also* Brief of Appellee ENGMC ("ENGMC App. Mem.") at 9.

tion for summary judgment and dismissing the petition at Enron's request because it "ignored well established principles of law, such as equitable subrogation, when it held that the Sureties were not entitled to the Excess Collateral"[45] and "did not have an equitable lien in and to the Margin, which included the Excess Collateral";[46] and "failed to acknowledge that the express terms of the contracts gave APEA (and therefore the Sureties) a right to retain the Excess Collateral and exercise whatever common law remedies were available to it at the time the transaction unwound."[47] The Sureties also argue that the Bankruptcy Court erred when it "failed to permit the Sureties . . . to setoff and/or recoup their losses from the Excess Collateral."[48]

### 1. Sureties' Subrogation Rights to Excess Collateral

The Sureties allege that they are entitled to the Excess Collateral because they are subrogated to the rights of both ENGMC and APEA. Accordingly, they claim an equitable lien on any remaining contract funds.[49] They further claim that such a lien is superior to ENGMC's rights to the Excess Collateral.

■ "The New York courts have long recognized and enforced the doctrine of subrogation."[50] "Subrogation" means "[t]he substitution of one person in the place of another [as] to a lawful claim, demand or right, so that he who is substituted succeeds to the rights of the other [as] to the debt or claim, and its rights, remedies, or securities."[51] "The right of subrogation . . . is founded upon the facts and circumstances of a particular case and upon principles of natural justice. . . ."[52] It is a "creature of equity, and 'is enforced solely for the purpose of accomplishing the ends of substantial justice.' "[53]

---

**45.** Federal App. Mem. at 3.

**46.** *Id.* American Home phrased its argument in a slightly different way, asserting that the Bankruptcy Court "erroneously held that if the Excess Collateral is 'owned by' rather than 'owed to' ENGMC, then the Sureties' subrogation and equitable lien rights do not entitle them to recover the Excess Collateral." American Home App. Mem. at 5.

**47.** Federal App. Mem. at 4.

**48.** *Id.* In the Joint Designation of Items to Be Included in Record on Appeal and Statement of Issues to Be Presented ("Jt.Designation"), the Sureties presented an additional issue:
Whether the Bankruptcy Court erred when it failed to hold that the Plaintiff Sureties were entitled to the Excess Collateral pursuant to 11 U.S.C. § 362(b)(6)'s safe harbor provision allowing for setoff between parties to forward contracts without requirement of lifting the automatic stay.
Jt. Designation ¶ 6. Under section 362(b)(6), "a petition filed under section 301, 302, or 303 of this title . . . operates as a stay, applicable to all entities, of—any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(b)(6). Neither party briefed this issue, nor did the Bankruptcy Court address it. Because I find that the Sureties have no right to the contested funds through subrogation, recoupment, or setoff, I need not reach this issue.

**49.** *See* American Home App. Mem. at 18; Federal App. Mem. at 12.

**50.** *In re QC Piping Installations, Inc.,* 225 B.R. 553, 563 (Bankr.E.D.N.Y.1998).

**51.** *Black's Law Dictionary* 1427 (6th Ed.1990). "Subrogation appears commonly in construction contracts, insurance contracts, suretyship, and negotiable instrument law." *Id.*

**52.** *In re QC Piping Installations, Inc.,* 225 B.R. at 563 (quoting *Pittsburgh–Westmoreland Coal Co. v. Kerr,* 220 N.Y. 137, 143, 115 N.E. 465 (1917)).

**53.** *Corporate Buying Serv. v. Lenox Hill Radiology Assocs.,* No. 92 Civ. 3374, 1995 WL 608288, at *3 (S.D.N.Y. Oct. 17, 1995).

"In the suretyship context, subrogation provides a secondary obligor [surety] who performs the secondary obligation with the obligee's rights with respect to the underlying obligation as though that obligation had not been satisfied." [54] Where the principal obligor is bankrupt, the Supreme Court has explained that *"if the surety at the time of adjudication was . . . either the outright legal or equitable owner of [the] fund,* or had an equitable lien or prior right to it, this property interest . . . never became a part of the bankruptcy estate to be . . . distributed to general creditors of the bankrupt." [55]

### a. Sureties' Right to Subrogation as to APEA

■ The Sureties argue that they are entitled to the Excess Collateral through subrogation to the rights of APEA. I have reviewed the decision of the Bankruptcy Court on this issue and adopt it in full. The Bankruptcy Court correctly held that:

> If APEA did not have the right to look to the Excess Collateral as a source for the Termination Payment, then the Sureties would not acquire such a right by subrogation.

> The plain language of the GPA provides that the Termination Payment was to be paid solely from the proceeds of the Surety Bond, GPA, art. 4.1(b), and proceeds of the Surety Bond were not to be

applied to the payment of any amounts due as Market Exposure Damages. GPA, art. 3.6. Further, the GPA provided that obligations to pay Market Exposure Damages were to be secured by the Margin Agreement and amounts payable from the Margin Agreement were to be applied solely to the payment of Market Exposure Damages. GPA, art. 3.6. Thus, these two separate sources were plainly intended to fund the separate payment obligations.

While the Margin Agreement provided APEA with a security interest in the Margin Account, it was only as "security for the payment of the Market Exposure Damages." *See* Margin Agreement ¶ 7, p. 7. Thus, these unambiguous contract provisions establish the rights of the parties concerning the Termination Payment and Market Exposure Damages. APEA did not have a right to look to the amounts payable from the Margin Agreement to fund the Termination Payment and the Sureties cannot acquire a greater right by subrogation to APEA's interest.

The Sureties argue that the Margin Agreement allowed for the possibility that APEA could acquire some greater interest by exercise of its rights pursuant to section 8 of the Margin Agreement.[56] . . .

---

**54.** Restatement (Third) of Suretyship and Guaranty § 27 cmt. a (1996).

**55.** *Pearlman v. Reliance Ins. Co.,* 371 U.S. 132, 136, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962) (emphasis added). Consequently, "[w]hen a surety performs in the place of a debtor and completes the contract, the entitlement to contract funds arises. Thus, subrogation places the surety in the position to exercise the debtor's rights to identifiable contract funds, effectively removing the property from the estate and rendering it unavailable to general creditors." *In re Alcon Demolition, Inc.,* 204 B.R. 440, 447–48 (Bankr.D.N.J.1997).

**56.** Section 8 of the Margin Agreement states: Upon failure of Seller timely to pay Market Exposure Damages, the Buyer or its designee may, and shall if so directed by Seller, liquidate any non-cash Margin . . . and apply any cash Margin . . . to the Market Exposure Damages then due in such order as the Buyer or its designee may direct. The rights and remedies of Buyer under this Agreement shall be cumulative to all other rights and remedies available to Buyer at law, and the exercise or partial exercise of any such right or remedy shall not preclude the exercise of any other right or remedy.

The Sureties, however, are not entitled to setoff with respect to the Margin Account. Section 553 of the Bankruptcy Code permits the setoff of mutual debts that arose before the commencement of the case. *In re Bennett Funding Group, Inc.*, 146 F.3d 136, 138–39 (2d Cir.1998). The section preserves whatever rights of setoff a party has under applicable non-bankruptcy law. *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995). A setoff concerns a defendant reducing a plaintiff's claim against it by its claim against the plaintiff which arises out of a different transaction than the one upon which the plaintiff [bases] its claim. . . .

APEA expressly waived its right to assert setoff in this instance. Pursuant to section 8.3 of the GPA, where express remedies and measures of damages for breach of any provision were provided, the obligor's liability was limited to those remedies and damages. As previously discussed, Art. 3.6 and Art. 4.1(b) of the GPA set forth express remedies and measures of damages concerning the Termination Payment and the Margin Account. The remedies and damages set forth were the sole and exclusive ones available and all other remedies and damages at law or in equity were waived. GPA, art. 8.3. . . . Inasmuch as section 8.3 of the GPA set forth that the availability of specific remedies and measures of damages for breach of a contract provision operated as a waiver of other remedies or damages at law or in equity, the right to seek setoff for payment of the Termination or Market Exposure Damages was "expressly . . . waived" in the GPA. As such, the right to seek setoff concerning the Termination Payment or Market Exposure Damages was excluded from those setoff rights that were reserved and was expressly waived pursuant to the GPA.[57]

For the foregoing reasons, the Sureties have no right to the Excess Collateral through subrogation to APEA's rights.

#### b. Sureties' Right to Subrogation as to ENGMC

■ The Sureties argue that their subrogation rights entitle them to "step into the shoes" of ENGMC and exercise all of ENGMC's rights pursuant to all agreements executed in connection with the GPA. Specifically, the Sureties contend that through subrogation, they have a right to the Excess Collateral that is superior to that of ENGMC's general unsecured creditors.[58]

This argument lacks merit. *First*, as the Bankruptcy Court notes, "the Excess Collateral was not owed to ENGMC under the Margin Agreement but, rather, was owned by ENGMC."[59] That is, the Excess Collateral was ENGMC's property—ENGMC placed funds into the margin account in excess of its obligations under the Margin Agreement.[60] The Excess Collat-

---

Margin Agreement ¶ 8, App. at 115.

**57.** 2/25/03 Order at 11–14, App. at 584–87.

**58.** While it is undoubtedly true that the Sureties are entitled to payment from ENGMC pursuant to the indemnity agreements, *see, e.g.*, American Home Indemnity Agreement, App. at 135; Federal Insurance Indemnity Agreement, App. at 144, the question is whether the Sureties should be accorded priority over ENGMC's other creditors—whether the Sureties have, as the Bankruptcy Court found, a "general unsecured claim against the Debtors." 2/25/03 Order at 16, App. at 589.

**59.** 2/25/03 Order at 18, App. at 591.

**60.** ENGMC's ownership interest is supported by the language of the Bond Resolution, which specifically states that "any remaining

eral is thus not an amount payable or owing to ENGMC pursuant to the Margin Agreement.[61] In that respect, it is no different from cash deposited into ENGMC's general bank accounts, to which the Sureties would have no priority relative to ENGMC's general unsecured creditors.[62]

*Second,* even if the Excess Collateral was not "owned" by ENGMC but was "owing" to ENGMC pursuant to the Margin Agreement, the Excess Collateral is not "owing" under the Surety Bond, as it relates to the GPA. As noted by the Second Circuit, "where the duty of the principal [ENGMC] to the creditor [APEA] is fully satisfied, the suret[ies] [American Home and Federal] to the extent that [they have] contributed to this satisfaction[,][are] subrogated ... to the interests which the creditor has in security for the principal's performance and in which the creditor has no continuing interest."[63] Assuming that the Sureties are entitled to subrogate to the rights of ENGMC,[64] the Sureties' rights are limited to those rights arising out of the Surety Bond.[65] The Sureties had only one obligation under the GPA—to make the Termination Payment to APEA upon ENGMC's default. Accordingly, if a dispute had arisen between APEA and ENGMC over the magnitude of the Termination Payment, the Sureties *would* step into the shoes of ENGMC with respect to the disputed payment.[66] But, as the Sureties had no obligation to make payments to cover the Market Exposure Damages, they have no rights to step into ENGMC's shoes to recover the Excess Collateral in the margin account.

The Sureties point out that the Surety Bond provides that ENGMC and the Sureties "are held and firmly bound unto [APEA] in the maximum penal sum of

margin" was to be remitted to ENGMC "[u]pon termination of the Swap Agreement and payment [to Chase] of all early termination payments due from APEA." 4/7/99 Bond Resolution § 5.10(b), App. at 379.

61. This situation differs, for instance, from the *Alcon* case, in which the arbitration award owed to the debtor and through subrogation to the surety, was not a pre-existing property interest, but a payment arising from (and now owing to the debtor from) the wrongful termination of the contract at issue. *See In re Alcon Demolition, Inc.,* 204 B.R. at 443, 448.

62. *Cf., e.g., State Bank & Trust Co., Dallas v. Insurance Co. of the W.,* 132 F.3d 203, 206–07 (5th Cir.1997) ("The surety's right to contract proceeds flows ... from 'the common sense proposition that the contract retainage funds would never become available to any creditor unless the surety completed the project.'") (quoting *In re Merts Equip. Co.,* 438 F.Supp. 295, 297 (M.D.Ga.1977)).

63. *In re Yale Express Syst., Inc.,* 362 F.2d 111, 114 (2d Cir.1966) (quoting Restatement of Security § 141).

64. The Sureties argue that they are entitled to subrogate to the rights of the principal in this transaction, ENGMC. Although the "rights that a surety acquires through subrogation are normally the rights of the obligee [APEA]," ENGMC App. Mem. at 23, there is case law discussing subrogation to the rights of the principal. *See, e.g., In re John's Insulation, Inc.,* 221 B.R. 683, 688 (Bankr.E.D.N.Y. 1998) ("The surety is thus subrogated to the rights of the principal, and has rights to the funds that are due and are to become due under a contract, including any undisbursed proceeds previously earned and any retainages held until contract completion."); *In re Alcon Demolition, Inc.,* 204 B.R. at 448 (noting that subrogation "places the surety in the position to exercise the debtor's rights to identifiable contract proceeds").

65. *See, e.g., In re Alcon Demolition, Inc.,* 204 B.R. at 447–48.

66. *See, e.g., id.* at 443, 448.

[$300 Million]."[67] This, the Sureties argue, demonstrates that the constellation of agreements relating to the GPA should be viewed as an integrated transaction,[68] rather than discrete contracts. Under such an interpretation, the Excess Collateral could be considered amounts payable under the "integrated gas purchase transaction" to ENGMC and, therefore, owed to the Sureties through subrogation. But, under the express terms of the GPA, the Termination Payment was payable "*solely*" from the proceeds of the Surety Bond."[69] Accordingly, the parties clearly intended that the proceeds of the Surety Bond would only cover the Termination Payment owed to APEA under the GPA. Thus, the Sureties' argument that "the Excess Collateral and Sureties' payment on the Surety Bond [are] integrally related and inseparable"[70] fails, as it is inherently inconsistent with the plain meaning of the GPA. For the reasons set forth above, the Bankruptcy Court properly determined that the Sureties are not entitled to the Excess Collateral through subrogation to the rights of ENGMC. The Bankruptcy Court also properly concluded that the Sureties' claim against ENGMC as to the Excess Collateral is an unsecured creditor's claim.

### 2. Sureties' Rights to Setoff and Recoupment

■ The Bankruptcy Court's determination that the Sureties have no rights to setoff[71] or recoupment[72] is also affirmed for the reasons articulated in the Bankruptcy Court's memorandum decision and order.[73]

## III. CONCLUSION

For the foregoing reasons, the decision of the Bankruptcy Court denying the Sureties' motion for summary judgment and dismissing the complaint is affirmed in

67. Surety Bond, App. at 78.

68. *See* Transcript of October 17, 2002 Oral Argument Before Bankruptcy Court ("Tr.") at 95, App. at 536 (statement of Robert Lewin, counsel for American Home) ("It's clear that [ENGMC] as principal, is firmly bound to APEA for the maximum amount at the time this transaction began, that was possibly due under the various agreements. It is really absurd for the debtor to argue that this is a non recourse investment or non recourse obligation for ENGMC.").

69. GPA, art. 4.1(b) (emphasis added), App. at 124.

70. Reply Brief of Appellant American Home at 2. As American Home notes, "Debtors contend that the Excess Collateral ... has 'absolutely nothing to do' with the Sureties' $251 million payment.... The accuracy of this characterization is the crux of this case." *Id.*

71. *See supra* Part II.B.1.a.

72. Specifically, the Bankruptcy Court held:

The Sureties are not entitled to recoupment rights against the Excess Collateral. Even if the GPA, the Margin Agreement, the Surety Bond, the Indemnity Agreement, and the SWAP Agreement are all considered as one integrated transaction, the intent, as set forth in the contract, was to treat discrete units independently by securing the Termination Payment solely with the Surety Bond and securing Market Exposure Damages with the Margin Account. Thus by the unambiguous terms of the agreements, the parties knowingly assigned distinct forms of security to discrete parts of the transaction. As the contract specifically provided that these discrete obligations would be handled separately and in distinct ways, recoupment is not available to either APEA or the Sureties. *See Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138, 147–48 (2d Cir.2002).
2/25/03 Order at 17–18, App. at 590–91.

73. *See id.* at 12–14, App. at 585–87; *id.* at 17–29, App. at 590–91.

its entirety. The Clerk of the Court is directed to close this case.