**In re CAVALRY CONSTRUCTION, INC., Debtor,**

**Cavalry Construction, Inc., Plaintiff/Appellee,**

v.

**WDF, Inc., WDF, Inc./Cavalry Construction, Inc., Federal Insurance Company, Seaboard Surety Company and St. Paul Fire and Marine Insurance Company as its successor in interest, and Fidelity and Deposit Company of Maryland, Defendants/Appellants.**

**No. 09–CV–5122 (KMK).**

United States District Court, S.D. New York.

March 30, 2010.

Arlene Gordon Oliver, Esq., Rattet, Pasternak & Gordon–Oliver, LLP, Harrison, NY, for Plaintiff/Appellee/Debtor.

Howard S. Jacobowitz, Esq., The McDonough Law Firm, LLP, New Rochelle, NY, for Defendants/Appellants.

### OPINION AND ORDER

KENNETH M. KARAS, District Judge.

Appellants appeal from a Final Order of the Bankruptcy Court dated April 24, 2009. For the reasons given herein, the Order of the Bankruptcy Court is vacated in part and affirmed in part, and this case is remanded to the Bankruptcy Court for proceedings consistent with this Opinion.

### I. Background

#### A. Facts

This appeal deals with six public works projects (the "Projects"), known as Forsythe H. S., Julia Richman H. S., P.S. 127, I.S. 84, P.S. 4 and Bronx School for Law ("Bronx Law"). (Defs.' Br. Appealing Final J. of the Bankr.Ct. Dated & Entered Apr. 24, 2009 ("WDF's Mem.") 1, 3.) The relationships between the various Parties were the same for all of the Projects with the exception of Bronx Law. (*Id.* at 3.)

For all the Projects except Bronx Law, Appellant WDF, Inc. ("WDF") entered into a prime contract with the owner, The New York City School Construction Authority (the "SCA").[1] (*Id.*) Cavalry Construction, Inc. ("Cavalry" or "Appellee") was a subcontractor to WDF. (*Id.*)

---

1. In construction parlance, a prime contract is a contract entered into by the owner of a project with a main contractor who has full

For the Bronx Law Project, the owner, SCA, entered into a general construction contract with Silverite Construction Co., Inc. ("Silverite"). (*Id.*) Silverite then entered into a subcontract with WDF for three trades. (*Id.*) WDF, in turn, entered into a second-tier subcontract with WDF, Inc./Cavalry Construction, Inc. (the "Joint Venture"), which is a joint venture, for the masonry work included in those trades. (*Id.*) Finally, the Joint Venture entered into a third-tier subcontract with Cavalry. (*Id.*)

Cavalry commenced an adversary proceeding against WDF and then amended its complaint to seek recovery against the SCA, the Joint Venture, and Silverite. (*Id.* at 4.) Subsequently, Cavalry commenced separate actions against Federal Insurance Company ("Federal"), Seaboard Surety Company ("Seaboard") jointly and severally with St. Paul Fire and Marine Insurance Company ("St.Paul"), as Seaboard's successor in interest, Fidelity and Deposit Company of Maryland ("Fidelity"), and WDF's labor and material payment bond sureties on the Projects. (*Id.*) Cavalry then discontinued its Bronx Law action against Silverite. (*Id.*)

After a trial, the Bankruptcy Court, per Judge Adlai S. Hardin, Jr., ordered, inter alia, that judgment be awarded to Cavalry on its subcontract claims against WDF, and that Cavalry's public improvement liens against the SCA be foreclosed. (*Id.* at 5.) Appellants appealed and present three issues:

(1) Whether the Bankruptcy Court erred in holding WDF in breach of contract and liable for the additional work allegedly performed on [Bronx Law] . . . ;

---

or primary responsibility for the completion of the project.

(2) Whether the Bankruptcy Court erred in relying on an interested party's (president of Cavalry [sic] ) testimony on the issue of the value of the change order work . . .; and

(3) Whether the Bankrupcty Court erred in not applying the same standards of proof to WDF's backcharges as it did for Cavalry's damages.

(*Id.* at 1.)

All of these claims arise under New York law, as no party disputes. (WDF's Mem. 8–18 (repeatedly citing New York law); Appellee's Answering Appeal Br. ("Cavalry's Mem.") 3–28 (same)); *see also Postlewaite v. McGraw–Hill, Inc.,* 411 F.3d 63, 67 (2d Cir.2005) (applying New York law when the parties did not dispute that it applied).

### B. Procedural History

Appellants filed a notice of appeal on February 6, 2009. Briefing was completed on September 9, 2009. The Court held oral argument on March 11, 2010. At the same time as Appellants appealed in this case, the SCA appealed from the same Order of the Bankruptcy Court in another case (Case No. 09–CV–5123). At the request of the Parties, the Court is keeping the two cases separate and will issue separate opinions.

## II. Discussion

### A. Standard of Review

Pursuant to Bankruptcy Rule 8013, a District Court reviews a bankruptcy court's conclusions of law de novo and reviews findings of fact for clear error. *See* Fed. R. Bankr.P. 8013; *Lubow Machine Co. v. Bayshore Wire Prods. Corp. (In re Bayshore Wire Prods. Corp.),* 209 F.3d 100, 103 (2d Cir.2000) ("Like the District Court, we review the Bankruptcy Court's findings of fact for clear error, [and] its conclusions of law *de novo* . . . ."

(internal citations omitted)); *Am. Home Assurance Co. v. Enron Natural Gas Mktg. Corp. (In re Enron Corp.),* 307 B.R. 372, 378 (S.D.N.Y.2004) ("A bankruptcy court's conclusions of law are reviewed *de novo* and its findings of fact for clear error.").

 Under the clear error standard, "[t]here is a strong presumption in favor of a trial court's findings of fact if supported by substantial evidence," and a reviewing court will not upset a factual finding "unless [it is] left with the definite and firm conviction that a mistake has been made." *Travellers Int'l A.G. v. Trans World Airlines, Inc.,* 41 F.3d 1570, 1579 (2d Cir. 1994); *see also Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) ("[A] finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (internal quotation marks omitted)); *Ceraso v. Motiva Enters., LLC,* 326 F.3d 303, 316 (2d Cir.2003) (stating that an appellate court should not overturn a trial judge's choice "between permissible competing inferences"). In particular, "[t]he decisions as to whose testimony to credit . . . [are] solely within the provinces of the trier of fact. . . ." *Ceraso,* 326 F.3d at 316–17; *see also Anderson,* 470 U.S. at 575, 105 S.Ct. 1504 ("[W]hen a trial judge's finding is based on his decision to credit the testimony of . . . witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.").

### B. The Bronx Law Project

There are two contracts and two issues that are relevant to the Bronx Law Project. The first contract was the agree-

ment that established the 50/50 Joint Venture between Cavalry and WDF (the "Venture Contract"). (Cavalry's Mem. 3.) The second contract was a third-tier subcontractor agreement between the Joint Venture and Cavalry (the "Masonry Contract"). (WDF's Mem. 3.) The first issue is whether WDF was liable to Cavalry on either contract. The second issue is whether WDF was liable to Cavalry under New York's Lien Law § 42.

The Parties do not agree upon the theory the Bankruptcy Court used to render judgment in Cavalry's favor, nor upon which contract formed the basis for liability. (WDF's Mem. 6 (discussing breach of contract based on the Masonry Contract); Cavalry's Mem. 3 (discussing breach of fiduciary duty based on the Venture Contract).) To clarify the situation, the Court first addresses New York's breach of contract law, and then examines the Bankruptcy Court's holdings in order to demonstrate that breach of the Masonry Contract did not form the basis for Judge Hardin's Order.

### 1. New York's Breach of Contract Law

█ WDF seeks to invoke the general rule that one party cannot sue another for breach of contract unless the two parties are in privity. *See Yucyco, Ltd. v. Republic of Slovenia*, 984 F.Supp. 209, 215 (S.D.N.Y.1997) ("It is well established that a plaintiff in a breach of contract action 'may not assert a cause of action to recover damages for breach of contract against a party with whom it is not in privity.'" (quoting *Perma Pave Contracting Corp. v. Paerdegat Boat & Racquet Club, Inc.*, 156 A.D.2d 550, 549 N.Y.S.2d 57, 58 (App.Div. 1989))); *Crabtree v. Tristar Auto. Group, Inc.*, 776 F.Supp. 155, 166 (S.D.N.Y.1991) ("It is hornbook law that a nonsignatory to a contract cannot be named as a defendant in a breach of contract action unless it has

thereafter assumed or been assigned the contract."); *Spectrum Painting Contractors, Inc. v. Kreisler Borg Florman Gen. Constr. Co.*, 64 A.D.3d 565, 883 N.Y.S.2d 262, 272 (App.Div.2009) ("[A] subcontractor may not assert a cause of action to recover damages for breach of contract against a party with whom it is not in privity." (internal quotation marks and citation omitted)).

The only signatories to the Masonry Contract were Cavalry and the Joint Venture. (Cavalry's Mem. 3.) Cavalry argues that even though the Masonry Contract was signed only by Cavalry and the Joint Venture, the "functional equivalent of privity" existed between Cavalry and WDF. (*Id.* at 7.) Indeed, New York law recognizes privity-like relationships in construction situations under certain circumstances. *See, e.g., RLI Ins. Co. v. King Sha Group*, 598 F.Supp.2d 438, 443–44 (S.D.N.Y.2009) (stating that, under New York law, the "functional equivalent of privity" may be established when "the prime contract provided that the subcontractors would assume all the obligations and responsibilities" of the contractor, or, when the owner and subcontractor had "direct dealings" and the subcontractor knew that work was being done for the owner's benefit); *City Sch. Dist. of Newburgh v. Hugh Stubbins & Assocs., Inc.*, 85 N.Y.2d 535, 626 N.Y.S.2d 741, 650 N.E.2d 399, 401 (1995) (finding the functional equivalent of privity between the ultimate owner and the subcontractor when the construction company undertook construction on behalf of the ultimate owner, the ultimate owner was the intended beneficiary, and these facts were known to all parties); *Hamlet at Willow Creek Dev. Co. v. N.E. Land Dev. Corp.*, 64 A.D.3d 85, 878 N.Y.S.2d 97, 112 (App.Div.2009) (stating that "liability for negligent misrepresentations that harm noncontracting parties" may result from a relationship "so close as

to approach that of privity" (internal quotation and citations omitted)); *Brownell Steel, Inc. v. Great Am. Ins. Co.*, 28 A.D.3d 842, 813 N.Y.S.2d 550, 551 (App.Div.2006) (finding the "functional equivalent of privity" where the contract between the second tier subcontractor and the subcontractor "identified [the general contractor] as the intended beneficiary . . ., incorporated the terms of the separate subcontract between [the subcontractor] and [the general contractor], and [ ] provided that [the second tier subcontractor] was to assume all of the responsibilities of [the subcontractor] under its separate subcontract with [the general contractor]").

However, courts have refused to find liability for breach of contract between a subcontractor and the owner when the middle contractor was not the owner's agent and when there was no "evidence that [the owner] directly contracted with [the subcontractors] . . . for the performance of extra work." *Spectrum*, 883 N.Y.S.2d at 272; *see also Hamlet*, 878 N.Y.S.2d at 111 (refusing to find a "[r]elationship [a]pproaching [p]rivity" between the project owner and the subcontractor when the "subcontractor . . . undert[ook] to perform the contractual obligation of another," but the owner was "not a party to the payment and performance bonds" and the subcontractor's obligations under those bonds did not flow to the owner).

■■■■ The general rule that can be distilled from these cases is that when the subcontractor (or third-tier subcontractor) is engaged on behalf of the owner (or subcontractor), for the benefit of the owner (or subcontractor), and with the knowledge of all parties, then the "functional equivalent of privity" exists. The essential element of this doctrine is that the middle party works as the agent for the principal with the knowledge of all parties. The determination of whether the "functional equivalent of privity" exists, therefore, is a highly fact–dependent endeavor which must consider the de facto dealings between the relevant parties as well as the language of all relevant contracts.[2]

### 2. Bankruptcy Court's Holdings

Using New York's breach of contract law as the context, it is immediately apparent that the Bankruptcy Court did not rely on this theory to impose liability upon WDF. In Cavalry's Complaint in the underlying Bankruptcy case, Cavalry alleged a breach of obligations arising out of the Venture Contract, not the Masonry Contract. (Am.Compl.("Compl.") ¶ 112, *Cavalry Construction, Inc. v. WDF, Inc. (In re Cavalry Construction, Inc.)*, Adversary Proceeding No. 07–8318 (Bankr.S.D.N.Y. Jan. 15, 2008).)[3] At oral argument, Cavalry's counsel confirmed that Cavalry's claims were based on the Venture Contract. Judge Hardin's order, which was prepared by the Parties based on Judge Hardin's previous holdings during hearings, states that Cavalry "ha[d] established its entitlement in connection with its causes of action regarding change order claims against" WDF. (Final Order and J. ("Order") ¶ 3, *Cavalry* (Apr. 24, 2009).) Judge Hardin also held that Cavalry "ha[d] an independent right of recovery

---

**2.** In the negligent misrepresentation context, at least one court has said that "[g]enerally, the issue of whether a 'special relationship' [of near–privity] exists . . . should be left to the trier of fact." *In re Leslie Fay Cos. Sec. Litig.*, 918 F.Supp. 749, 769 (S.D.N.Y.1996).

**3.** Hereinafter, documents from the underlying adversary proceeding in the Bankruptcy Court will be cited as "[Document Name] ('[Short Form Name, if applicable]') [pin cite], *Cavalry* ( [Document Date] )" the first time the document is cited, and by the short form or document name in subsequent citations.

against" WDF and that WDF's "contention that its claim in the instant Bankruptcy litigation against [the SCA] fulfill[ed] the fiduciary duty owed to [Cavalry] by [WDF] in connection with the Bronx Law Project Joint Venture [wa]s rejected." (*Id.* ¶¶ 8–9.) Finally, Judge Hardin held that "[i]n connection with the Bronx Law Project, ... under Articles 5.2 and 5.6 of the [Venture Contract], the role of enforcing and marshaling the assets of the Joint Venture rested solely with [WDF,] and that [Cavalry]'s right to payment is not dependent or conditional upon such efforts." (*Id.* ¶ 11.) Thus, the Bankruptcy Court's Order was based, not on a breach of the Masonry Contract, but on an alternative theory arising from the Joint Venture Contract.

The Order references portions of the hearing transcripts where Judge Hardin was even more explicit. For example, Judge Hardin stated that WDF had "a fiduciary duty [ ] to press [certain] claims" and that "the [J]oint [V]enture, qua joint venture[,] couldn't do it. Only WDF could.... So I guess that's my ruling." (Tr. of Trial ("Jan. 13 Tr.") 180, *Cavalry* (Jan. 13, 2009); *id.* at 181 (stating that Cavalry's claim was "really not a construction claim issue. It [wa]s simply a breach of fiduciary duty issue").) Thus, when Judge Hardin stated that "Cavalry ha[d] sustained its burden of proof to show that there was money due and payable to ... WDF, from the SCA based upon the primary contract," he was not proceeding on a direct breach of contract theory, but on a breach of fiduciary duty theory, where the duty in question arose from the Venture Contract. (Tr. of Hr'g ("Jan. 27 Tr.") 76, *Cavalry* (Jan. 27, 2009).) In making this determination, the Court takes note of the fact that Judge Hardin did not examine issues surrounding the "functional equivalent of privity" and so there is no basis on which to conclude that Judge Hardin rested his holding on such a theory.[4]

### 3. *Cavalry's Venture Contract Claims Against WDF*

▆▆ WDF asserts that Cavalry failed to adequately plead a breach of fiduciary duty claim. (WDF's Reply Br. ("Reply Mem.") 2.) As Cavalry's tenth cause of action, it alleged a "[b]reach of the Bronx Law/Joint Venture Contract." (Compl. ¶¶ 138–39.) Again, it is important to note that the contract alleged to have been broken was the Venture Contract, not the Masonry Contract. Cavalry also alleged numerous other claims associated with the Bronx Law Project. (*Id.* ¶¶ 189–92 (asserting a quantum meruit claim on the "Bronx Law/Joint Venture Project"), ¶¶ 241–44 (seeking an accounting for the Bronx Law Project), ¶¶ 262–64 (asserting an unjust enrichment claim for conduct on the Bronx Law Project), ¶¶ 395–407 (asserting a claim under New York's Lien Law for "[l]ien [f]oreclosure of the Bronx School for Law [c]ontract").)[5] Finally, as noted above, Cavalry alleged that WDF had "breach[ed] [ ] its obligations under the Bronx Law/Joint Venture Contract [by] fail[ing], refus[ing] and/or neglect[ing] to pay to [Cavalry] the full amount due

---

4. If any doubt remains as to the grounds for Judge Hardin's ruling, it is dispelled by the fact that the only argument Cavalry made in the Bankruptcy Court opposing WDF's motion for summary judgment on this point was based on a breach of the fiduciary duty WDF allegedly owed as managing partner of the Joint Venture. (Mem. in Opp'n to Defs.' Mot.

for Partial Summ. J. 16–20, *Cavalry* (Sept. 22, 2008).)

5. Judge Hardin's Order resolved the Lien Law claims explicitly, as well as determining the rights and obligations at issue in this appeal. (Order ¶¶ 1–12.) The Parties do not appeal the disposition of Cavalry's other claims.

and owing for the labor and materials furnished at the Bronx Law/Joint Venture Project." (*Id.* ¶ 112.)

Of course, a pleading need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. Pro. 8(a)(2); *see also Ashcroft v. Iqbal*, — U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (stating that a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"). In this case, the Amended Complaint clearly put WDF on notice that Cavalry was seeking monies it believed it was owed due to conduct related to the Venture Contract and the Bronx Law Project. Therefore, the Court turns to the merits of this claim.

WDF reprises its argument that there is no privity on which to base a fiduciary obligation by reasserting the hierarchy of contractors and subcontractors. (Reply Mem. 1.) This argument lacks merit. The Joint Venture was a joint venture between WDF and Cavalry, and the fiduciary duty asserted is based upon the Venture Contract which created the Joint Venture. (Jan. 13 Tr. 180 (finding a fiduciary obligation to "enforc[e] the assets of" the Joint Venture).) WDF's refusal to acknowledge this point, despite repeated assertions by Cavalry, is curious.

WDF does not challenge the Bankruptcy Court's finding that it had a fiduciary obligation to the Joint Venture to obtain payments from Silverite for services rendered.[6] (*Id.;* Cavalry Construction's Trial Exs. ("Trial Ex.") WBG 339, ¶ 5.2, *Cavalry* (Joint Venture Agreement) ("All decisions, commitments, undertakings, understandings, or other matters pertaining to the

performance of the [Bronx Law] Project shall be within the full and exclusive control of [WDF].").)[7] The question before this Court, therefore, is whether Cavalry can directly assert the Joint Venture's fiduciary duty claim against WDF or, alternatively, whether WDF owed an independent fiduciary duty to Cavalry.

In the proceeding below, WDF primarily relied on *Handelsman v. Bedford Village Associates Ltd. Partnership*, 213 F.3d 48 (2d Cir.2000), *Poley v. Sony Music Entertainment, Inc.*, 222 A.D.2d 308, 636 N.Y.S.2d 10 (App.Div.1995), and *Shea v. Hambro America Inc.*, 200 A.D.2d 371, 606 N.Y.S.2d 198 (App.Div.1994), to argue that Cavalry could not assert a claim against WDF because "a partner [does not] ha[ve] standing to sue individually[ ] to recover assets due to the partnership." (Am. Mem. of Law in Supp. of WDF Inc.'s & the Joint Venture's Mot. for Partial Summ. J. ("WDF Summ. J.") 8–9, *Cavalry* (Sept. 11, 2008).) None of these cases, however, is dispositive here. In *Handelsman*, the Second Circuit held that because a partnership cause of action belongs to the partnership itself, the limited partners' representatives were indispensable parties in a suit that would "necessarily determine whether or not the limited partners must pay money to one of the partners." *Handelsman*, 213 F.3d at 54. In this case, Cavalry argues that WDF failed to adequately protect the assets of the Joint Venture, an issue that is wholly distinct from *Handelsman*. *Poley* and *Shea* are inapposite because they deal with instances in which an individual partner sued a third party in his individual capacity. *See Poley*, 636 N.Y.S.2d at 10; *Shea*, 606

---

6. Except, of course, by virtue of WDF's privity argument, which is discussed above.

7. No specific date is associated with Cavalry's trial exhibits. The pin cite refers to Bates numbers followed by a citation native to the document, if applicable.

N.Y.S.2d at 198. In this case, one partner (Cavalry) sued another partner (WDF).

██ In this appeal, WDF argues that Cavalry was permitted to enforce the Joint Venture's rights against Silverite once WDF had refused to do so and that, in any case, "[o]nce Cavalry assumed the burden of such litigation [by suing in the Bankruptcy Court], the Joint Venture [and, hence, WDF] was relieved of such obligation." (Reply Mem. 2–3.) WDF's conclusion is that its fiduciary duties could have been fulfilled by Cavalry, and have now been fulfilled, and that WDF is therefore not in breach of its fiduciary obligations.

WDF is correct that, in certain circumstances, New York allows limited partners to bring derivative claims against third parties. *See* N.Y. P'ship Law § 115–a (McKinney 2005) (providing for derivative actions by limited partners); *Tzolis v. Wolff*, 10 N.Y.3d 100, 855 N.Y.S.2d 6, 884 N.E.2d 1005, 1007 (2008) (recognizing that § 115–a had codified the holdings in *Klebanow v. N.Y. Produce Exch.*, 344 F.2d 294 (2d Cir.1965), and *Riviera Cong. Assocs. v. Yassky*, 18 N.Y.2d 540, 277 N.Y.S.2d 386, 223 N.E.2d 876 (1966), which held that limited partners have the right "to sue for the benefit of the trust in a cause of action which belongs to the trust if the trustees refuse to perform their duty in that respect" (internal quotation marks omitted)). However, the law states that a limited partner *may* bring a derivative action, not that a limited partner *must* bring such an action or forfeit other rights. *See* N.Y. P'ship Law § 115–a(1) (McKinney 2005); *212 Inv. Corp. v. Kaplan*, 800 N.Y.S.2d 358 (Table), 6 Misc.3d 1031(A), at *4 (Sup.Ct.2005) ("Partnership Law § 115–a merely provides that limited partners *may* bring derivative actions to address harm to limited partnerships." (emphasis added)).

██ Leaving WDF's arguments behind, and returning to the question *sub judice*, leads back to cases which distinguish between when a limited partner may assert a claim against the general partner directly rather than proceeding with a derivative claim. In *Excimer Associates, Inc. v. LCA Vision, Inc.*, 292 F.3d 134 (2d Cir.2002) (per curiam), two joint venturers sued each other for breach of contract, promissory estoppel and breach of fiduciary duty on the basis that the other had failed to live up to their respective obligations under the joint venture agreement. *Id.* at 137. The Second Circuit held that whether the claims could proceed depended upon whether they asserted a "direct injury." *Id.* at 139–40. " '[T]he critical question posed by the direct injury test is whether the damages a plaintiff sustains are derivative of an injury to a third party. If so, then the injury is indirect; if not, it is direct.' " *Id.* (quoting *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 238–39 (2d Cir.1999)); *see also Bartfield v. Murphy*, 578 F.Supp.2d 638, 646 (S.D.N.Y.2008) (stating, in the context of claims against each other by shareholders of an LLC, that "[t]he issue is whether the 'primary injury' for which relief is sought directly affects an interest the plaintiff holds, or if it injures the legal entity's interests, which then derivatively injures the plaintiff"). "[W]here the plaintiff's injury is direct, the fact that another party [such as the joint venture itself] may also have been injured and could assert its own claim does not preclude the plaintiff from asserting its claim directly." *Excimer*, 292 F.3d at 140.

██ That the injury at issue in this case was caused by a breach of fiduciary duty does not affect the outcome. *See Solutia, Inc. v. FMC, Corp.*, 385 F.Supp.2d 324, 332 (S.D.N.Y.2005) (distinguishing between cases involving a breach of fiduciary duty

owed to the corporation, where only derivative claims are permissible, and a breach of fiduciary duty owed to a particular party as well as, or in addition to, the corporation, where direct claims are permissible); *Longo v. Butler Equities II, L.P.,* 278 A.D.2d 97, 718 N.Y.S.2d 30, 32 (App.Div. 2000) (rejecting a breach of fiduciary duty claim between partners in a limited partnership because the defendant's alleged actions "could only have reduced the value of the partnership's investment ... impacting plaintiff only insofar as his pro rata share was concerned"). At this juncture, it is important to distinguish two issues. There can be no question that WDF owed a general fiduciary duty to Cavalry. *See Meisel v. Grunberg,* 651 F.Supp.2d 98, 114 (S.D.N.Y.2009) ("[P]artners owe fiduciary duties to co–partners."); *Appell v. LAG Corp.,* 41 A.D.3d 277, 838 N.Y.S.2d 541, 542 (App.Div.2007) (finding that plaintiff had established that a fiduciary obligation existed because plaintiff and defendant were partners). However, WDF is not alleged to have engaged in self–dealing, fraud, or some similar breach of a general obligation. Rather, WDF is alleged to have breached a specific duty arising out of the Venture Contract. Therefore, the question of whether WDF owed a direct fiduciary duty to Cavalry depends upon the language in the Venture Contract (as, under the facts of this case, there is no other relationship that could establish a direct fiduciary duty from WDF to Cavalry). *See Solutia,* 385 F.Supp.2d at 332 (requiring a duty owed directly from one partner to another before allowing a direct action).

 Judge Hardin based his determination that WDF had breached its fiduciary duties on two paragraphs contained in the Venture Contract. (Jan. 13 Tr. 180 (citing paragraphs 5.2 and 5.6 of the Venture Contract as the basis for finding a

"fiduciary duty").) Those paragraphs state:

> 5.2 *Managing Joint Venturer.* WDF is hereby declared to be the Managing Joint Venturer ("MJV"). All decisions, commitments, agreements, undertakings, understandings, or other matters pertaining to the performance of the Project shall be within the full and exclusive control of the MJV. No Representative of the MJV shall be liable to the parties by reason of his acts as a Representative, except in cases of gross negligence or actual fraudulent or dishonest conduct.
>
> ...
>
> 5.6 *WDF Obligations.* In addition to those obligations as may be set forth elsewhere in this Agreement, WDF, with input from [Cavalry], shall do all the purchasing for the Joint Venture, arrange for the preparation and execution of further subcontracts, if necessary, track and process shop drawings and submissions, and shall prepare and submit requisitions for the Joint Venture.

(Trial Ex. WBG 339, WBG 340–41, ¶¶ 5.2, 5.6 (emphasis in original).)

 The question that arises from these provisions is whether they create fiduciary duties running from WDF to Cavalry as well as the fiduciary duties they clearly create running from WDF to the Joint Venture. "Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed." *Terwilliger v. Terwilliger,* 206 F.3d 240, 245 (2d Cir.2000) (citing *Breed v. Ins. Co. of N. Am.,* 46 N.Y.2d 351, 413 N.Y.S.2d 352, 385 N.E.2d 1280, 1282 (1978)). Thus, the Court's analysis properly starts with the four corners of the Venture Contract to determine whether the meaning is unambiguous. *See RJE Corp. v. Northville Indus. Corp.,* 329

F.3d 310, 314 (2d Cir.2003) (where a " 'contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence' " (quoting *De Luca v. De Luca*, 300 A.D.2d 342, 751 N.Y.S.2d 766, 766 (App.Div. 2002))); *Terwilliger*, 206 F.3d at 245 ("[M]atters extrinsic to the agreement may not be considered when the intent of the parties can fairly be gleaned from the face of the instrument." (citing *Teitelbaum Holdings, Ltd. v. Gold*, 48 N.Y.2d 51, 421 N.Y.S.2d 556, 396 N.E.2d 1029, 1032 (1979))). The ultimate determination of the Parties' intent depends on the text of the Venture Contract and not on the fact that the Parties urge different interpretations of that contract. *See Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir.1990) ("Language whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation."); *O.D.F. Optronics Ltd. v. Remington Arms Co.*, No. 08–CV4746, 2008 WL 4410130, at *11 (S.D.N.Y. Sept. 26, 2008) (" 'The language of a contract is not made ambiguous simply because the parties urge different interpretations.' " (quoting *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir.1992))). Finally, contract interpretation is a matter of law and so the Court reviews the Bankruptcy Court's determination de novo. *See Kamfar v. New World Rest. Group, Inc.*, 347 F.Supp.2d 38, 48 (S.D.N.Y.2004) ("Under New York law, the initial interpretation of a contract is a matter of law for the court to decide.").

Paragraph 5.2 of the Venture Contract was designed to accomplish two things. First, it made explicit that WDF was the MJV. Second, it explained what the MJV was expected to do, that is, to manage the business of the Joint Venture, not Cavalry's business (at least, not directly). Therefore, the most natural reading of Paragraph 5.2, is that it explains what

WDF's duties were as manager of the Joint Venture. Paragraph 5.6 is more explicit, twice repeating that the various obligations WDF was to perform were "for the Joint Venture." (Trial Ex. WBG 340–41, ¶ 5.6.)

It follows, therefore, that the clear language of the Venture Contract established duties running from WDF to the Joint Venture, and not fiduciary duties running from WDF to Cavalry. Thus, Cavalry's injury was an indirect injury. Therefore, Cavalry was not entitled to pursue a direct claim against WDF. This conclusion is also supported by the particular facts of this case. WDF failed to collect monies owed to the Joint Venture by Silverite. (Jan. 13 Tr. 180.) Any recovery, therefore, would be owned by the Joint Venture, even if the Joint Venture was then obligated to pay the monies to Cavalry, as a partner in the Joint Venture. *See Henneberry v. Sumitomo Corp. of Am.*, 415 F.Supp.2d 423, 440 (S.D.N.Y.2006) ("[A]n individual shareholder lacks standing to bring his or her claim where 'the duty owed to the shareholder is indistinguishable from the duty owed to the corporation.' " (quoting *Vincel v. White Motor Corp.*, 521 F.2d 1113, 1121 (2d Cir. 1975)) (internal brackets and ellipse omitted)); *Bank of Am. Corp. v. Lemgruber*, 385 F.Supp.2d 200, 224 (S.D.N.Y.2005) ("A corporate officer or director generally owes a fiduciary duty only to the corporation over which he exercises management authority, and any breach of fiduciary duty claims arising out of injuries to the corporation in most cases may only be brought by the corporation itself or derivatively . . . ."); *Kavanaugh v. Wetmore*, 103 A.D. 95, 92 N.Y.S. 543, 545 (App.Div.1905) ("The plaintiff's right to maintain this action is derivative and wholly based on the failure of the corporation to do its duty in prosecuting an action to recover corporate assets."); *Corso v. Byron*, 816 N.Y.S.2d 694 (Table), 11 Misc.3d 1072(A), 2006 WL 825216 at *5 (Sup.Ct.2006) ("While this

court is cognizant that other states may recognize a right of direct action on behalf of a shareholder in a close corporation to recover for waste or fraud, New York does not favor such litigation ...." (internal citation omitted)).[8]

The Bankruptcy Court's Order, to the extent that it relies on a fiduciary relationship arising out of the Venture Contract, therefore, must be reversed. However, because it appears possible that, if it had addressed the question, the Bankruptcy Court could have found that a privity-like relationship existed between WDF, as subcontractor, and Cavalry, as third-tier subcontractor, the Bankruptcy Court's order is vacated and the case is remanded to that Court for proceedings consistent with this Opinion.[9]

### 4. Lien Law Claim

 New York's Lien Law allows a lien to be enforced against a "contractor or subcontractor liable for the debt." N.Y. Lien Law § 42 (McKinney 2007); see L & W Supply Corp. v. A.D.F. Drywall, Inc.,

55 A.D.3d 1026, 865 N.Y.S.2d 159, 160 (App.Div.2008) (requiring plaintiff to demonstrate "that there were funds due and owing" from the general contractor to a subcontractor). Since WDF is not directly liable to Cavalry, it follows that Cavalry cannot advance a claim—on this issue—under New York's Lien Law. Because Judge Hardin appeared to base his conclusion at least in part on his determination that Cavalry could recover against WDF (Jan. 27 Tr. 75–76 (discussing the Lien Law claims and fiduciary duty claims together)), and because there remains at least a possibility that WDF is directly liable to Cavalry if Cavalry has pled, and can show, a "functional equivalent of privity," Judge Hardin's judgment is vacated and the issue is remanded to the Bankruptcy Court for proceedings consistent with this Opinion.

### C. Cavalry's Damage Claims on the Remaining Projects

In their Memoranda of Law, the Parties spill much ink on the damage claims con-

---

8. The situation was actually slightly more complicated. WDF was owed the money by Silverite and, in turn, owed the money to the Joint Venture, which owed the money to Cavalry. (Jan. 13 Tr. 180.) WDF, as MJV of the Joint Venture, was thus obligated to seek the money from WDF, as subcontractor. A lack of privity potentially prevented the Parties from jumping positions in this chain. Thus, the recovery WDF, as MJV, could seek was recovery owned by the Joint Venture, whereas the recovery WDF, as subcontractor, could seek cannot be sought by Cavalry in this action because of a lack of privity (unless Cavalry can show the "functional equivalent of privity"). It is possible that WDF, as subcontractor, and Cavalry, as third-tier subcontractor, had a relationship which was the "functional equivalent of privity," but, as noted before, that is a highly fact intensive claim that the Bankruptcy Court did not address.

9. It is important to note some subjects on which the Court has not rendered any opin-

ion. The Court expresses no opinion as to whether the Joint Venture would be entitled to collect the monies that form the basis of Cavalry's claim against WDF in this appeal. The Court also expresses no opinion as to whether Cavalry is entitled to recovery based on a derivative action on behalf of the Joint Venture against WDF, or on whether Cavalry is entitled to recovery based on a direct action, as third-tier subcontractor, against the Joint Venture. Likewise, the Court does not decide the question of whether the functional equivalent of privity existed between WDF, as subcontractor, and Cavalry, as third-tier subcontractor, since that is an issue, at least initially, for the trial court. See In re Leslie Fay, 918 F.Supp. at 769. Finally, the Court offers no opinion on whether Cavalry's pleadings are sufficient to allow it to pursue these alternative theories of liability or, if Cavalry's pleadings are insufficient, on any issue regarding amending the complaint or the statute of limitations. These issues are not before this Court.

cerning the remaining projects. At oral argument, WDF's counsel clarified the issue: WDF argues that Judge Hardin based his determination, at least in part, on pre-work estimates, either directly or via oral testimony that was itself based solely on pre-work estimates, and that such evidence is, as a matter of law, an insufficient basis on which to award judgment to Cavalry. WDF confirmed that this was their position in a letter to the Court, which states: "WDF objected at trial and argues in this appeal that Cavalry's change order proposals constitute either incompetent pre-work estimates or postwork tallies[ ] prepared well after work was performed. . . . [This evidence does not] constitute the type of contemporaneous detailed records [required by law]. . . ." (Letter from Howard S. Jacobowitz, Esq., to the Court (Mar. 19, 2010) ("Jacobowitz Letter") 1.)

 Given WDF's clarification, many of the arguments in the Memoranda need not be fully addressed. Cavalry argues that various claims that WDF might be making were not preserved for appeal. (Cavalry's Mem. 9–13.) However, WDF is not arguing that Kerry Timmons ("Timmons"), who was "Cavalry's principal" (*Id.* at 10), had no basis of personal knowledge or that his testimony, or the other evidence submitted, was irrelevant. Similarly, the other arguments that Cavalry believed were raised (*Id.* at 11–13), need not be discussed. In the end, WDF's objections to the "competen[cy]" of the evidence (WDF's Mem. 8), are objections to the nature of the evidence, rather than to its admissibility, and to the sufficiency of the evidence to establish Cavalry's damages.

The Court, therefore, will first consider the nature of the evidence Cavalry offered at trial. Though the majority of Cavalry's damage claims were based on numerous documents, the documents were substantially identical and it suffices to discuss an example, as WDF did when cross–examining Timmons at trial. (Tr. of Trial ("Dec. 15 Tr.") 24, *Cavalry* (Dec. 15, 2008).) A representative document submitted to the SCA by Cavalry, is labeled "Change Order Proposal # 1A," and states "[p]lease find herein our proposal to perform [certain change order work]." (Trial Ex. WBG 153.) WDF argues that the natural conclusion is that these documents were proposals—i.e. that they were prepared before the work was completed. (WDF's Mem. 8.) However, at trial, Timmons testified that "[w]ith an SCA project[,] when additional work is identified . . . you're supposed to proceed with the work immediately . . . , and then subsequent to that submit your cost proposal. . . . It's called that because they require it to be called that but more times than not[,] it is a post work computation. . . ." (Dec. 15 Tr. 16.) Timmons further testified that he had reviewed "the so-called proposals" and that "[f]or the most part[,] they were [prepared] after the work was done." (*Id.* at 16–17.) Timmons was cross examined on this point extensively, and continued to assert that "proposals" were proposals in name only, and reflected post-work computations. (*Id.* at 25, 29–30, 37.)

WDF provides further support for its position in the Jacobowitz Letter, where WDF urges the Court to compare two change order documents that Cavalry sent to WDF. (Jacobowitz Letter 2.) [10] The first document is entitled "Change Order Pro-

---

**10.** The Bates numbers cited in the Jacobowitz Letter and the Bates numbers on the documents provided to the Court are not the same. The Court will use the Bates numbers that appear on the documents provided to the Court, and has confirmed with Mr. Jacobowitz that the documents are the same.

posal # 17," and the letter speaks prospectively of work yet to be completed. (Trial Ex. WBG 919, 1.) The second is called an "Invoice," and provides a specific date in the past on which the work was completed. (*Id.* at WBG 928, 1.) The lesson WDF would have the Court draw is that Cavalry was entirely capable of distinguishing proposals from invoices and, hence, the letters sent to the SCA should be interpreted according to their plain meaning and be considered pre-work proposals. However, WDF made this same argument at trial, and Timmons explained that the language of the letters sent to WDF should not be used to interpret the language of the letters sent to the SCA because the SCA had special rules as to the form invoices had to take. (Dec. 15 Tr. 28–30.)

In light of this evidence, WDF's first argument is unpersuasive. Citing *Kenford Co. v. County of Erie,* 67 N.Y.2d 257, 502 N.Y.S.2d 131, 493 N.E.2d 234 (1986), WDF argues that Cavalry did not meet its burden of proof because the evidence it presented did not establish the quantum of damages with reasonable certainty. (WDF's Mem. 8–9.) *Kenford,* however, addresses the question of *future* damages and holds that such "damages may not be merely speculative, possible or imaginary, but must be reasonably certain." *Kenford,* 502 N.Y.S.2d 131, 493 N.E.2d at 235. In other words, the fact that the plaintiff will incur damages at some point in the future must be reasonably certain before liability for those damages can be imposed. *Kenford* has nothing to say about what level of certainty is required to prove the quantum of past damages already accrued.

WDF's second argument is closer to the mark, though raised in an ineffective manner. In its brief, WDF offers a quotation from *Metropolitan Steel Industries, Inc. v. Perini Corp.,* 36 A.D.3d 568, 828 N.Y.S.2d

395, 396 (App.Div.2007), as support for its argument that, as a matter of law, pre-work estimates are not a permissible basis on which to fix the quantum of damages. As quoted in WDF's brief, the quotation reads: "At trial, Steelco relied on its change order estimates as proof of the value of the extra work. Steelco did not submit information regarding actual costs; *Steelco's reliance on its estimates as proof of the value of the extra work was improper.*" (WDF's Mem. 10 (emphasis in original).) However, the actual quote is as follows:

> At trial, Steelco relied on its change order estimates as proof of the value of the extra work. Steelco did not submit information regarding its actual costs; indeed, the only actual cost document was introduced by Perini, and seems to undercut some of Steelco's arguments regarding its purported costs. Steelco's reliance on its estimates as proof of the value of the extra work was improper.

*Metro. Steel,* 36 A.D.3d at 569, 828 N.Y.S.2d 395. The court in *Metropolitan Steel* held that reliance on an estimate was improper where it was contradicted by evidence of actual costs submitted by another party. *Metropolitan Steel,* therefore, is distinguishable on its facts, as the only actual cost documents that the Parties point to in this case are the "proposals," which Timmons claimed were "proposals" in name only, and, in fact, were post-work calculations. Cavalry submits that, in accord with *Metropolitan Steel,* the "proposals" "substantiate [Cavalry's] damages using actual costs." *Id.*

The other cases WDF cites in support of its argument are similarly unhelpful. WDF seeks to demonstrate that "[t]he Bankruptcy Court's award of damages to Cavalry [for work performed but not paid for], partly based upon [Cavalry's] pre-work estimates of what the change order

work would or should cost, was improper." (Reply Mem. 6.) To do so, WDF relies on one out of a line of cases that holds that pre-bid (not pre-work) estimates are insufficiently reliable to calculate the damages caused by delay in construction (not damages caused by failure to pay for work actually performed). *See Aniero Concrete Co. v. N.Y. City Constr. Auth.*, No. 94–CV–9111, 2003 WL 21018842, at *4 (S.D.N.Y. May 5, 2003) (discussing this line of cases in order to distinguish it from the case before the court); *All–States Commc'ns, Inc. v. N.Y. Tel. Co.*, No. 96–CV–5740, 1997 WL 729033, at *4 (S.D.N.Y. Nov.24, 1997) ("It is well settled in New York that pre-bid estimates may not be used in calculating an award of damages because of their inherent unreliability."); *Novak & Co. v. Facilities Dev. Corp.*, 116 A.D.2d 891, 498 N.Y.S.2d 492, 493–94 (App.Div.1986) (rejecting the proof proffered because of the "inherent unreliability of price elements of a bid as well as the fact that not all of the delays can be attributed to the fault of the defendant"). These cases, therefore, differ for three reasons. First, Cavalry's estimates were, accepting WDF's argument, pre-work, not pre-bid. Second, this case does not deal with costs due to delay. Third, Cavalry alleged, and Timmons testified, that the "proposals" were actually post-work calculations of actual cost.

The point WDF is attempting to make is that pre-work estimates may be a legally insufficient basis for calculating the value of Cavalry's change order work. However, even according to WDF, Judge Hardin could rely on documents, "which[ ] Mr. Timmons testified were [prepared] 'shortly after performing the work'" (WDF's Mem. 11), and on Timmons' testimony. Judge Hardin could properly base his conclusions on such evidence, as explained by Judge Haight, as follows:

"We reject the ... contention that claims under public construction con-

tracts must be proved by written business records.... We know of no statute, rule or decisional law which requires proof in such form.... [T]o the extent that oral testimony is credited by the trier of facts in the absence of business records, and the claim is thus allowed, we know of no predicate [for the proposition that such evidence is] ... insufficien[t] as a matter of law. Arguments now advanced ... that the oral testimony ... was speculative [or] based to a very large extent on [the witness'] subjective memory alone ... [a]ll touch on issues of credibility and weight of evidence as to findings of fact...."

*Aniero Concrete*, 2003 WL 21018842, at *3 (quoting *D'Angelo v. State*, 39 N.Y.2d 781, 385 N.Y.S.2d 284, 350 N.E.2d 615, 615 (1976)); *see also W.M.S. Builders, Inc. v. Newburgh Steel Prods., Inc.*, 289 A.D.2d 567, 735 N.Y.S.2d 802, 802 (App.Div.2001) ("'Proof of damages [for breach of contract] may be based solely on oral testimony so long as the witness has knowledge of the actual costs.'") (quoting *Elec. Servs. Int'l v. Silvers*, 284 A.D.2d 367, 726 N.Y.S.2d 441, 442 (App.Div.2001)); *Reed Paving, Inc. v. Glen Ave. Builders, Inc.*, 148 A.D.2d 934, 539 N.Y.S.2d 173, 173 (App.Div.1989) (noting that "plaintiff sought recovery for additional work performed ... beyond that required by the contract" and stating that "[p]roof of damages may be based upon oral testimony alone, so long as the witness has knowledge of the actual costs"). WDF does not allege that Mr. Timmons did not have knowledge of the actual costs. Instead, WDF argues that Mr. Timmons' testimony should be given little weight because of his obvious self interest, because of lack of memory, and because Timmons' definition of preparing something "shortly after" an event could mean that the document was prepared four months after the work was

completed. (WDF's Mem. 11–13 (quoting Dec. 15 Tr. 36).) However, as these are issues that affect the weight that should be accorded to Timmons' testimony, *see Aniero Concrete*, 2003 WL 21018842, at *3 (noting that claims that "oral testimony ... was speculative, based ... on [ ] subjective memory alone, reflected such selective acuity or recollection as to be suspect, was not otherwise substantiated ..., and similar contentions ... [a]ll touch on issues of credibility and weight of evidence" (internal quotation marks omitted)), there is no basis on which this Court can say that, as a matter of law, the Bankruptcy Court erred in crediting his testimony and relying on it to calculate damages. *See Anderson*, 470 U.S. at 575, 105 S.Ct. 1504 ("[W]hen a trial judge's finding is based on his decision to credit the testimony of ... witnesses ... [who have told a] facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error."); *Aniero Concrete*, 2003 WL 21018842, at *3 (stating that "to the extent oral testimony is credited by the trier of fact" it is not "insufficien[t] as a matter of law" (internal quotation marks omitted)). Therefore, the Bankruptcy Court's order on this issue is affirmed.

### D. WDF's "Backcharge" Claim on P. S.4

WDF argues that (1) the Bankruptcy Court's judgment allowing some but not all of WDF's backcharges was based on a view of the facts that was "in part, factually incorrect," and (2) the Bankruptcy Court "did not apply the same standards as to the [P]arties' damages." (WDF's Mem. 16–17.) Thus, WDF's arguments cover both fact—which the court reviews for clear error—and law—which the Court reviews de novo.

At trial, WDF attempted to prove that it was entitled to backcharges based on "three categories" of evidence. (Tr. of Trial ("Apr. 10 Tr.") 140, *Cavalry* (Apr. 10, 2009); WDF.'s Mem. 16.) The first category of evidence "consist[ed] of backcharges [ ] as to which there is a reflection on the contemporaneous daily records." (Apr. 10 Tr. 140.) The second category of evidence "consist[ed] of handwritten notations on the daily reports [that comprised the first category]." (*Id.* at 141.) The third category of evidence "appear[ed] in the so-called scratch sheets, which were handwritten sheets prepared ... approximately ten days [before April 10, 2009]." (*Id.*) Judge Hardin allowed WDF's claims based on the first category, and denied them as to the other two. (*Id.* at 142.) WDF appeals only the denial of evidence based on the second category. (WDF's Mem. 17–18.)

Judge Hardin explained his ruling at trial. "Mr. [Joseph] Zarelli [ ('Zarelli'), a site supervisor for WDF,] has testified that th[e] handwritten notations are all in his handwriting and ... [were written] in on or about September of 2007. At that time[,] Mr. Zarelli believed and understood that there was controversy between WDF and Cavalry." (Apr. 10 Tr. 4, 141.) Judge Hardin also considered "that the existence of a not insubstantial notation ... on the very contemporaneous documents on which WDF does and must rely [i.e., on WDF's first category of evidence,] raises a serious question as to the reliability ... of the handwritten notations added to the documents ... months later in September, after the parties were in actual litigation." (*Id.* at 143.) WDF's first argument is that since the adversary proceeding "was commenced on November 7, 2007[,] and the handwritten notations were made prior thereto, in September 2007," Judge Hardin's ruling was based on a mistake of fact. (WDF's Mem. 16.)

█ In this case, Judge Hardin's "error," was, at most, a misstatement. First,

Judge Hardin originally stated that when the handwritten notations were added "Mr. Zarelli believed and understood that there was controversy between WDF and Cavalry," not that the Parties were already involved in litigation. (Apr. 10 Tr. 141.) Second, Cavalry filed a voluntary petition for Chapter 11 Bankruptcy on July 27, 2007, months before the handwritten notations were added. (Voluntary Petition (Dkt. No. 1), *In re Cavalry Construction, Inc.*, Bankr.Pet. No. 07–22707 (Bankr.S.D.N.Y. July 27, 2007).) Third, Mr. Zarelli testified that he was asked to add the handwritten notations by his project manager and that, at that time, he "wasn't aware that WDF [was] being sued by Cavalry[, but he] ... knew there w[ere] legal proceedings going on." (Apr. 10 Tr. 39, 118.) WDF advances no reason to believe that Judge Hardin's ruling would have been any different had he stated that "legal proceedings were going on" (which is, essentially, what he originally stated), as opposed to stating that the Parties "were in actual litigation." Accordingly, if there was any error at all, it was harmless and not grounds for reversal. *See McReynolds v. Richards–Cantave,* 588 F.3d 790, 800–02 (2d Cir.2009) (finding that one of the district court's findings of fact was clearly erroneous, but upholding the result because the error was "harmless"); *In re Adler, Coleman Clearing Corp.,* 204 B.R. 99, 106 (Bankr.S.D.N.Y.1997) ("An error is harmless if it is not 'inconsistent with substantial justice' or does not 'affect the substantial rights of the parties.'" (quoting *Citibank v. Arens (In re Arens),* 139 B.R. 667, 669 (Bankr.N.D.Ohio 1991)) (internal quotation marks omitted)).

■ WDF's legal argument—that different standards were applied to WDF's and Cavalry's proofs of damages—is more accurately characterized as a complaint that Cavalry's testimony was credited when it relied on documents that WDF believes to have little probative weight, but that WDF's testimony was not credited when it involved handwritten notations that WDF believes do have probative weight. (WDF's Mem. 13–18.) This argument is off the mark. Issues of credibility and weight are issues for the fact finder. *See Anderson,* 470 U.S. at 574, 105 S.Ct. 1504 (holding that a factfinder's inference based on physical or documentary evidence cannot be clearly erroneous if it represents a "choice between" "two permissible views of the evidence"); *Ceraso,* 326 F.3d at 316–17 ("The decisions as to whose testimony to credit ... [are] solely within the provinces of the trier of fact...."); *Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L.,* 264 F.3d 32, 38 (2d Cir.2001) ("As the finder of fact, the district court is in the best position to make the necessary credibility judgments and discern what the facts are."). Indeed, Judge Hardin credited Zarelli's testimony as to WDF's first category of evidence, but found that the circumstances surrounding the handwritten notations made them less credible. Such a credibility determination was perfectly consistent with believing Timmons' testimony, which, unlike Zarelli's, was not contradicted by other contemporaneous records. Therefore, the Bankruptcy Court's Order on this issue is affirmed.

## III. Conclusion

For the reasons given herein, the Order of the Bankruptcy Court is vacated in part and affirmed in part, and this case is remanded to the Bankruptcy Court for proceedings consistent with this Opinion. The Clerk of the Court is respectfully requested to close this case.

SO ORDERED.